Rosen Bien & Galvan, LLP via Email and U.S. Mail
Attorneys at Law
Tenth Floor
315 Montgomery St
San Francisco, CA 94104

 Re: *Valdivia v. Schwarzenegger,*
 *Comito* Balancing and Hearsay Exceptions

Dear Mr. Stewart:

 In response to your letter dated December 15, 2006 stating Plaintiff's concern regarding the use of hearsay evidence in parole revocation hearings and the training to be given to Deputy Commissioners, it is Defendant's position that DCs have always been allowed to use hearsay exceptions, both those found in the Federal and California Rules of Evidence. If no hearsay exception from either of these Rules applies, then a <u>Comito</u> balancing test will be applied.

Sincerely,

.

Carl D. Ecklund
Staff Counsel
Court Compliance Team
(916) 324-1986

In re DURA PHARMACEUTICALS,
INC. SECURITIES
LITIGATION.

This Document Relates
To: All Actions.

No. 99CV0151 JLS (WMc).

United States District Court,

S.D. California.

Feb. 20, 2008.

Michael D. Donovan, Donovan Searles, Philadelphia, PA, Steven J. Toll, Cohen Milstein Hausfeld & Toll, Washington, DC, William S. Lerach, Lerach Coughlin Stoia Geller Rudman and Robbins, Jeffrey R. Krinsk, Finkelstein and Krinsk, San Diego, CA, William F. Sullivan, Paul, Hastings, Janofsky & Walker LLP, Timothy J. Burke, Stull Stull and Brody, Los Angeles, CA, for Plaintiff.

William F. Sullivan, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING IN PART WITHOUT PREJUDICE AND DENYING IN PART MOTION TO DISMISS FOURTH CONSOLIDATED AMENDED COMPLAINT

JANIS L. SAMMARTINO, District Judge.

This is a putative class action for securities fraud. Presently before the Court is the motion to dismiss the Fourth Consolidated Amended Complaint ("FCAC") by defendants Dura Pharmaceuticals, Inc. ("Dura"); Cam L. Garner; James W. Newman; Charles W. Prettyman; and Walter F. Spath (collectively, "defendants").[1] (Doc. No. 138.) Defendants' motion focuses on the allegations pertaining to Dura's Albuterol Spiros inhaler, which failed to obtain FDA approval, and on all allegations concerning Prettyman,

---

1. Also before the Court is defendants' request for judicial notice. (Doc. No. 141.) Defendants' request is unopposed. Insofar as the Court has relied on the documents in defendants' request, that request is **GRANTED.** With respect to SEC filings, the Court takes judicial notice only of the statements contained therein, but not for the purpose of determining the truth of those statements. (*See* Doc. No. 135, at 26 n. 3) (citing *Troy Group, Inc. v. Tilson,* 364 F.Supp.2d 1149, 1152 (C.D.Cal.2005).)

Dura's Senior Vice President of Development and Regulatory Affairs. For the reasons stated herein, with respect to the Albuterol Spiros inhaler, the Court grants in part and denies in part. With respect to the allegations concerning Prettyman, the Court grants the motion to dismiss.

## BACKGROUND

### A. Factual Background

The Court incorporates by reference the thorough description of the background facts of this case contained in the Hon. M. James Lorenz's Order granting in part and denying in part the motion to dismiss the third consolidated amended complaint ("TAC").[2] (Doc. No. 135, at 2:1–7:20.) To the extent that the FCAC contains the same factual allegations, the Court does not repeat them here. Where the FCAC provides greater specificity concerning those allegations, the Court addresses those new allegations in its substantive analysis *infra*.

Generally speaking, this case is a putative class action brought by purchasers of Dura securities between April 15, 1997 and February 24, 1998 ("class period"). (FCAC ¶ 1.) Plaintiffs allege violations of federal securities laws arising from the development of the Albuterol Spiros inhaler, "a method of aerosolizing powders so that asthma medicines ... could be inhaled." (*Id.* ¶ 3.) Plaintiffs allege that, despite the discovery of problems during the product development process that effectively guaranteed rejection by the Food and Drug Administration ("FDA"), defendants nonetheless pushed forward with a new drug application ("NDA") and represented to the public that the inhaler would

reach the market as a matter of course after obtaining FDA approval.

Plaintiffs further allege violations of federal securities laws arising from misrepresentations and omissions regarding Dura's sales of its primary drug, Ceclor CD. (FCAC ¶ 29.) Plaintiffs specifically allege "a scheme to artificially inflate [Dura's] revenues and earnings" by unloading excessive amounts of Ceclor CD onto wholesalers with unusually favorable terms so as to maximize Dura's revenues and earnings per share. (*Id.* ¶ 34.) While Dura represented that sales of Ceclor CD were strong and on the rise, those sales actually declined throughout the class period.

### B. Procedural Background

With respect to events in this litigation preceding the Order on the TAC, including the decision of the United States Supreme Court on the issue of loss causation, this Court incorporates by reference the thorough description of Judge Lorenz's Order concerning the procedural history of this case. (Doc. No. 135, at 5:22–7:20.) On June 2, 2006, Judge Lorenz dismissed plaintiffs' claim with respect to the Albuterol Spiros inhaler. Although the TAC adequately alleged loss causation, Judge Lorenz dismissed for the failure to plead with sufficient particularity the source of plaintiffs' allegations with respect to falsity and scienter. (Doc. No. 135, at 21:27–22:3.) Plaintiffs were not sufficiently specific in their descriptions of various Dura internal reports detailing problems in the inhaler's development. (*Id.* at 20:15–21:15.) Also, plaintiffs did not describe any confidential witnesses to support allegations regarding Dura executives' knowledge of those problems or fraudulent in-

---

**2.** Judge Lorenz's Order granting in part and denying in part the TAC is also a published opinion. *See In re Dura Pharms., Inc. Sec. Litig.,* 452 F.Supp.2d 1005 (S.D.Cal.2006).

The Court cites interchangeably to the *Federal Supplement* and the Order docketed in this case, *i.e.,* Doc. No. 135.

tent to conceal those problems. (*Id.* at 21:16–17.) "The absence of such allegations [was] significant because the crux of Defendants' malfeasance comes from their decision to forge ahead with clinical trials and the NDA submission notwithstanding their inability to remedy the problems identified" in the early stages of product development. (*Id.* at 21:23–26.)

Judge Lorenz further held that plaintiffs adequately stated a claim against Dura, Newman, Garner, and Spath concerning these defendants' representations and omissions in the scheme to overload wholesalers with Ceclor CD. (Doc. No. 135, at 29:8–10.) With respect to the remaining defendants,[3] Judge Lorenz found that the TAC did not successfully impute liability based on group pleading, stock sales, their corporate positions, or motive. (*Id.* at 29:10–13.) Judge Lorenz limited the scope of the claim to exclude statements in securities analysts' reports. (*Id.* at 35:25–27, 37:3–6.) Judge Lorenz found that the TAC failed to allege the specific statements that defendants made to the analysts. (*Id.* at 35:25–26.)

Judge Lorenz granted plaintiffs leave to file an amended complaint. (Doc. No. 135, at 37:2–6.) On July 21, 2006, plaintiffs filed the FCAC. (Doc. No. 137.) On September 5, 2006, defendants moved to dismiss the FCAC. (Doc. No. 138.) Plaintiffs filed their opposition on October 19, 2006. (Doc. No. 144.) Defendants replied on November 13, 2006. (Doc. No. 146.) The motion was then deemed submitted as of December 4, 2006. (Doc. No. 149.)

This case was reassigned to the Hon. Janis L. Sammartino on October 3, 2007. On November 14, 2007, after the Court set the matter for oral argument, but before oral argument took place, plaintiffs submitted a supplemental brief concerning the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). (Doc. No. 154.) Defendants submitted their own supplemental brief on November 29, 2007. (Doc. No. 156.)

The Court held oral argument on the motion on December 14, 2007. After the matter was taken under submission, plaintiffs submitted a second supplemental brief on February 1, 2008 concerning the Seventh Circuit's decision in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 2008 WL 151180 (7th Cir. Jan. 17, 2008). (Doc. No. 158.) Defendants filed a second responsive supplemental brief on February 12, 2008. (Doc. No. 159.)

## LEGAL STANDARD

The Court incorporates by reference Judge Lorenz's thorough description of the applicable law pertinent to motions to dismiss in securities class actions. (*See* Doc. No. 135, at 7:21–10:7.) That description explained, *inter alia,* the requirement to plead falsity and scienter with particularity under the Private Securities Litigation Reform Act (PSLRA).

 Since Judge Lorenz's Order on the TAC, the Supreme Court clarified that, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court "must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). The Court explained that the strength of an inference depends on its particular context: "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the

---

3. Prettyman is the only one of these defendants who reappears in the FCAC.

plaintiff." *Id.* at 2510. A complaint survives a motion to dismiss under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## DISCUSSION

### A. Sources of the FCAC's Allegations

 When plaintiffs base their allegations on information and belief, "[i]t is not sufficient ... to set forth a belief that certain unspecified sources will reveal ... facts that will validate [plaintiffs'] claim." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 985 (9th Cir.1999); *In re Immune Response Sec. Litig.,* 375 F.Supp.2d 983, 1023 (S.D.Cal.2005). Although a complaint may keep confidential the identities of personal sources, those confidential witnesses "should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.' " *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1233 (9th Cir.2004); *Alaska Elec. Pension Fund v. Adecco S.A.,* 371 F.Supp.2d 1203, 1211 (S.D.Cal.2005). A complaint relying on anonymous confidential witnesses must also contain "adequate corroborating details." *Nursing Home,* 380 F.3d at 1233; *Adecco,* 371 F.Supp.2d at 1211. To determine the adequacy of allegations based on confidential witness accounts, the court evaluates " 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of the sources, [and] the reliability of the sources.' " *In re Daou Sys., Inc.,* 411 F.3d 1006, 1015 (9th Cir.2005) (quoting *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29 (1st Cir.2002));

*Limantour v. Cray Inc.,* 432 F.Supp.2d 1129, 1141–42 (W.D.Wash.2006).

 Where plaintiffs rely on internal reports, plaintiffs must provide such details as the sources of the plaintiffs' information about the reports, the way plaintiffs learned about them, the authors, the officers receiving the reports, and an "adequate description" of the contents. *Silicon Graphics,* 183 F.3d at 985; *Adecco,* 434 F.Supp.2d at 831. Here, plaintiffs rely on internal reports as the corroboration of the confidential witnesses. Judge Lorenz's prior Order found that plaintiffs provided sufficient details to establish the reliability of the Eisele List, a summary of problems with the inhaler originally prepared in October 1996 by Dura's Vice President of Product Development. (Doc. No. 135, at 20:7–14.) Otherwise, however, Judge Lorenz found that plaintiffs insufficiently alleged the existence of other internal reports, *e.g.,* analyses of chemical stability test results, minutes of product development meetings, configuration modification reports, and product reliability reports. (*Id.* at 20:15–21:15.) Because of plaintiffs' reliance on the corroborating details in the internal reports, the Court begins with its analysis of the internal reports and then evaluates the reliability of the confidential witnesses.

#### 1. Internal Reports

Although Judge Lorenz found sufficient indicia of reliability concerning the Eisele List, Judge Lorenz found the TAC's allegations inadequate with respect to three other types of documents: (1) chemical stability test results and analytic reports allegedly circulated during product development meetings; (2) modification reports drafted by Senior Project Engineer Mike Ligotke and Project Leader Linda Gieschen; and (3) product development re-

ports, also prepared by Ligotke and Gieschen.

With respect to the stability tests and analytic reports, the FCAC remains vague, even after amendment, concerning the authors of those reports. (FCAC ¶ 11.) While citing confidential witnesses as plaintiffs' sources concerning those reports, the FCAC still does not explain, in turn, how the confidential witnesses themselves learned of those reports. The ongoing deficiencies in plaintiffs' pleading of these reports are mitigated, however, by the confidential witness accounts of the product development problems. Confidential witnesses identify the specific problems that were allegedly discovered during the stability tests and the ways that the product development team communicated those problems to the defendants.

Plaintiffs have provided further details concerning Ligotke and Gieschen's modification reports. Plaintiffs cite confidential witnesses as their source for learning about the reports. (FCAC ¶¶ 95, 122.) Plaintiffs now explain who received these reports (namely, Prettyman and the Regulatory Affairs Department), although the FCAC remains vague concerning the frequency of the "periodic basis" when these reports were prepared and distributed. (Id.) The FCAC pleads the content of those reports with greater specificity, explaining how the modification reports distinguished among the various inhaler configurations and the tests that Dura ran on each. (Id.)

The allegations concerning the product development reports are responsive to some of the defects identified by Judge Lorenz, but still remain problematic. The FCAC now explains that the reports were generated and distributed between mid–1996 and October 1997, during the class period and contemporaneous with the Eisele list. (FCAC ¶ 17.) Nonetheless, the FCAC remains vague as to the contents of these reports, and how they differ from the modification reports.

### 2. Confidential Witnesses

The FCAC alleges the existence of 28 confidential witnesses[4] who support the FCAC's allegations of falsity and scienter. (FCAC ¶ 65.) The number of legitimately pled CWs is smaller, however. As defendants point out, the FCAC only describes ten CWs in detail, and attributes factual allegations only to seven. (Memo. ISO Motion, at 4 n. 6.) The Court focuses its analysis on the three CWs whose allegations are most central[5] to the FCAC: CW3, CW6, and CW10.

The FCAC describes CW3 as follows:

CW3 is a former Dura Senior Project Engineer/Staff Engineer on Albuterol Sprios (sic) drug delivery system. CW3 worked for Dura's Product Development Department from 8/96 until 5/00. CW3 was a Senior Project Engineer and was involved in "all aspects of the engineering and manufacturing scale-up activities" on the Spiros drug delivery system until 8/98. At that point, CW3 was pro-

---

4. The Court abbreviates the reference to a confidential witness as "CW# ". For example, Confidential Witness No. 6 is identified as "CW6".

5. Plaintiffs do not dispute that the FCAC fails to attribute any factual allegations to CW1, CW4, and CW5. The FCAC cites CW2 and CW9 once, as corroboration of the problems with mechanical failures described more thor-

oughly by other CWs and documented in internal reports (including the Eisele list). (FCAC ¶ 10.) CW7's only contribution is the corroboration of CW3's account of internal dissension within Dura as to whether to proceed with Phase III clinical trials and the NDA. (Id. ¶ 9.) CW8's account entirely overlaps with (and is less thorough than) CW10's account.

moted to Staff Engineer. CW3 was involved with preparing the company's NDA for the Spiros drug delivery system and helped draft the Chemical Manufacturing Controls ("CMC") sections of the application, which described how the device was made and the materials used to make it. (FCAC ¶ 65(c).) CW3 is the source of the FCAC's allegations concerning electro-mechanical problems in the inhaler's configuration, resulting in a greater than 30% failure rate during clinical trials. (FCAC ¶¶ 119 & 121.) The FCAC also cites CW3 for the allegation that the individual defendants learned of the inhaler's problems during executive management meetings held every Monday morning. (*Id.* ¶ 121.) In one such meeting in October 1996, CW3 alleges that senior management obtained the Eisele list. (*Id.* ¶ 123.) Plaintiffs cite CW3 for the proposition that Dura's engineering staff opposed conducting Phase III clinical trials or filing an NDA until the problems with the inhaler's configuration had been fixed. (*Id.* ¶ 9.) According to CW3, Garner and Prettyman also attended inhaler product development team meetings to discuss the results of clinical trials and stability tests. (*Id.* ¶ 121.) At one particular meeting, Garner specifically asked about the inhaler's reliability: the inhaler development team responded that over 30% of the inhalers failed in clinical trials. (*Id.* ¶ 124.) Finally, CW3 claims that, prior to filing the NDA, Garner and Prettyman met with FDA officials in Washington, DC to discuss the FDA's concerns about the reliability of the inhaler and the stability of Albuterol. (*Id.*)

The Court finds CW3 to be a reliable source with respect to the electro-mechanical problems in the inhaler's configuration and the meetings with Garner, Prettyman, and the product development team. The FCAC describes with particularity CW3's extensive involvement in the inhaler devel-opment process before, during, and after the class period. Therefore, CW3 would be aware of any problems with the inhaler; furthermore, the identification of the same problems in the Eisele list (previously found by Judge Lorenz to be supported by reliable allegations) corroborates CW3's account of those problems. As an engineer on the inhaler development team, CW3 would know about the fact and substance of the team's meetings with senior management. CW3's memory of the substance of those meetings, included specific questions posed by Garner, supports a finding of reliability.

CW3 is not a reliable source, however, for allegations of meetings among Dura senior management officials and with FDA officials. The FCAC does not explain how CW3 would know when senior management meetings took place or what documents were distributed in those meetings, much less what executives actually discussed in those meetings. Even less plausible is CW3's knowledge of the fact, much less the substance, of a meeting in Washington, DC between FDA officials and executives of San Diego-based Dura.

The FCAC describes CW6 as follows: "CW6 is the former Vice President of Engineering Development. CW6 joined Dura in 1998 and was responsible for the ongoing development of the Spiros inhaler device for which Dura had filed a NDA with the FDA in 11/97." (FCAC ¶ 65(f).) The Court declines to detail here all the factual allegations for which the FCAC cites CW6 as the source. Instead, the Court simply notes that all those allegations took place before CW6 began working for Dura in 1998. The FCAC provides no explanation for why CW6 would have knowledge of events that transpired before his employment with Dura. While plaintiffs "number each witness and describe his or her job

description and responsibilities," *Daou Systems*, 411 F.3d at 1016, these details do not allow the Court to overlook the unlikelihood that someone in CW6's position would possess the information alleged, *Nursing Home*, 380 F.3d at 1233. Therefore, the FCAC's allegations citing CW6 as their source are almost entirely inadequate, except for those allegations which are corroborated by other sources.[6] (*See, e.g.*, FCAC ¶ 9 (citing CW3 *and* CW6 for confirmation of the Eisele list).)

The FCAC describes CW10 as follows: "CW10 is a former Manager in the Regulatory Affairs Department throughout the Class Period. CW10 reported to Kathleen Heffernan, Director of Regulatory Affairs, who in turn reported to defendant Prettyman. CW10's responsibilities included attending cross-functional meetings regarding product development as the main representative of the Regulatory Affairs Department." (FCAC ¶ 65(j).) Citing CW10, the FCAC alleges that defendant Prettyman "was involved" in the creation of Dura's press releases, and Dura required all press releases to go through the Regulatory Affairs Department. The FCAC further relies on CW10 (with CW8 corroborating[7]) for the allegation that "the Individual Defendants were each responsible for personally reviewing and/or 'signing off' on all SEC

filings and press releases issued by Dura during the Class Period[.]" (*Id.* ¶ 64; *cf.* ¶ 174.) The Court finds that CW10, having a position within the Regulatory Affairs Department and working for someone who directly reported to Prettyman, is a reliable source concerning the procedures of the department and Prettyman's specific "involvement" in creating press releases.

### B. Albuterol Spiros Inhaler

#### 1. *Factual Allegations*

The Court incorporates by reference the thorough description of plaintiffs' allegations with respect to the Albuteros Spiros inhaler, which appears in Judge Lorenz's Order on the TAC. (Doc. No. 135, at 10:14–14:13.) Where the FCAC's allegations are different or described more specifically, the Court discusses those new allegations in its analysis *infra*.

#### 2. *Materially False Statements*

Where a private securities plaintiff alleges that the defendant made an untrue statement of material fact or omitted a material fact needed to make the statements actually made not misleading, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is mislead-

---

6. At oral argument, the Court asked plaintiffs' counsel how CW6 could be a reliable source. Counsel informed the Court that CW6 "was hired in 1998 to do a comprehensive and thorough review of the history of the Albuterol Spiros efforts to date. He reviewed all the documents in the file ... and those documents had the defendants' names cc'd all over them." (Transcript, at 8:4–11.) Quite simply, none of this appears in the FCAC, and the Court has found no legal authority that would allow it to go beyond the four corners of the FCAC and credit CW6 as a reliable source on the basis of a job description that plaintiffs failed to plead. In the nearly twenty-two months since plaintiffs filed the FCAC (and

during the yearlong period when this motion remained under submission), plaintiffs never attempted to amend their description of CW6. Therefore, as much as this additional information would heighten CW6's reliability as a source, the Court cannot consider it in deciding the present motion.

7. CW8 worked in investor relations throughout the class period; CW8's duties included circulating press releases to upper management and then issuing them to the public. (FCAC ¶ 65(h).) The Court finds that CW8 is a reliable source concerning Dura's practices in preparing and issuing press releases.

ing, and, if an allegation ... is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir.2002). "[A] statement that is literally true can be misleading and thus actionable under the securities laws." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citing *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir.1994)).

In the context of statements regarding FDA approval, courts dismiss securities fraud claims where a drug manufacturer predicts FDA approval several years in advance, despite complications in the testing phase, because "the company could have known of problems in the testing procedures, planned to remedy those deficiencies, and still thought it would achieve FDA approval by the estimated date." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930 (9th Cir.1996); *see In re Connetics Corp. Sec. Litig.*, 542 F.Supp.2d 996, 1007–08 (N.D.Cal.2008) (dismissing claim with respect to statements that "may have been in the optimistic belief that the [drug's] testing problem was a surmountable barrier to FDA approval"). By contrast, during the FDA evaluation process, courts have allowed securities fraud claims to go forward where the drug manufacturer allegedly made "misleading, optimistic public statements that [the drug's] FDA-approval process was progressing positively[,]" even though clinical studies indicated that the drug "might not work and would never be approved by the FDA." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.1996); *see In re Amylin Pharms., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *8 (S.D.Cal. May 1, 2003) (holding that a company cannot represent that its trial results met the FDA's re-

quirements for approval where, in fact, "the FDA expresse[d] significant concerns regarding the sufficiency of the trials").

◼ Many of defendants' statements alleged in the FCAC fail to satisfy the definition of material falsity because they are either factually true or merely predictive of FDA approval at a distant date, when Dura still had opportunity to remedy any deficiencies. To the extent that Dura reported the completion of clinical trials or indicated its intent to file an NDA in the second half of 1997, there simply is no false statement. (*See, e.g.*, FCAC ¶¶ 73, 107.) The Court also does not find material falsity in the 1997 Annual Report, wherein Dura described the inhaler's intended design as "compact, durable, and reusable." (*Id.* ¶ 76.) The filing of the NDA was still more than six months away, giving Dura adequate time to remedy the deficiencies in its clinical testing so that the inhaler would conform to the intended design. Similarly, statements regarding Dura's expectation of FDA approval were not materially false while Dura continued to evaluate data from recently completed clinical trials. (*Id.* ¶ 75.)

◼ Nonetheless, the Court finds that plaintiffs have adequately alleged material falsity, beginning with defendants' representations concerning the marketing of the inhaler less than four months before filing the NDA on November 10, 1997. (FCAC ¶ 145.) Specifically, on July 15, 1997, Dura held a conference call, in which Garner and Newman told securities analysts that "Dura was close to successfully ... bringing the Spiros drug delivery system to market in 1998." (*Id.* ¶ 116.) Garner and Newman repeated these statements about ten days later in a "roadshow" with securities analysts and institutional investors, and made similar statements[8] in confer-

---

8. Specifically, Dura told investors that it "was on track" to bring the inhaler to the market

ence calls on October 14, 1997 and January 20, 1998. (*Id.* ¶¶ 126, 143, 157.) These statements were materially false when made because, as alleged by plaintiffs, Dura was *not* close to marketing the inhaler in 1998 because the clinical trials progressed in a way that doomed the inhaler's prospects of FDA approval. Most importantly, plaintiff alleges the inhaler experienced a 30% early return rate (though industry standards dictated a return rate of less than 1%) and demonstrated electro-mechanical malfunctions during trials.[9]

■ Dura allegedly made further materially false statements after it submitted the NDA application. Dura's advertisement in the April 1998 issue of a journal of respiratory medicine stated that the inhaler "is designed to deliver a relatively consistent dose of drug to the lungs, independent of the patient's ability to inhale forcefully." (FCAC ¶ 162.) In addition to the factors cited above, this alleged statement is materially false for the reasons stated in the FDA's subsequent letter of rebuke, *i.e.*, that the advertisement "promotes an unapproved drug by making claims of safety and efficiency that have not been demonstrated by substantial evidence[.]" (*Id.* ¶ 163.) The final materially false statement is the alleged November 3, 1998 press release, which stated that the FDA's letter of rejection did not raise issues concerning the clinical data in the NDA application. (*Id.* ¶ 165.) This alleged statement was materially false, *inter alia*, for the reasons stated in the NDA's

notice of violation, *i.e.*, the press release's failure to explain that the FDA was requiring Dura to submit totally new clinical data. (*Id.* ¶ 166.)

■ Because several of defendants' materially false statements were allegedly made to securities analysts and then repeated in analyst reports, the Court confronts the question of whether the statements in the analyst reports are actionable. In the prior Order on the TAC, Judge Lorenz dismissed plaintiffs' claims based on analyst reports because "[t]he TAC d[id] not contain any allegations specifying the statements Defendants made to analysts." (Doc. No. 135, at 35:25–26.) The FCAC cures this deficiency by pleading the specific statements that defendants made to the analysts in the roadshow and conference calls. Plaintiffs have moved beyond the TAC's conclusory allegations that the analyst reports repeated information provided by defendants: the FCAC now states the precise statements that defendants allegedly communicated to the analysts.

"[W]hen statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable[.]" *Nursing Home*, 380 F.3d at 1235. By contrast, the statements are not actionable when analysts "repackaged defendants' actual oral statements in vague and impres-

---

by late 1998 or early 1999.

9. Even more compelling evidence of material falsity is that, by changing the inhaler's configuration during the Phase III clinical trials, Dura guaranteed the invalidation of those trials and, thus, the rejection of the NDA application. The concept that Dura sabotaged its own NDA is the strongest evidence of the falsity of statements that the inhaler was "on track" for introduction to the market after

timely FDA approval. However, the only source cited for that proposition is CW6 (*see* FAC ¶ 119), who did not begin to work for Dura until 1998. For reasons stated previously, based on the FCAC's description of CW6 (as opposed to counsel's additional representations at oral argument), the Court finds that CW6 is not a reliable witness for events taking place at Dura prior to the beginning of CW6's employment.

sionistic terms." *In re LeapFrog Enters., Inc. Sec. Litig.,* 527 F.Supp.2d 1033, 1051 (N.D.Cal.2007) (citing *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1246–47 (N.D.Cal. 1998)). Applied to these facts, the Court finds that the FCAC adequately alleges that the statements in the analyst reports "clearly originated from" Dura, Garner, and Newman, and, furthermore, the analysts did not repackage those statements.[10] The analyst reports quoted in the FCAC explain that Dura was "on track" to begin selling the inhaler in late 1998 and "confirmed" a launch date for the inhaler. (FCAC ¶¶ 144, 158.) These are the exact statements that Dura allegedly made to the analysts in the first instance, rather than the analysts' own projections, interpretations, or impressions.

Finally, the Court finds that plaintiffs have carried their burden "to set forth an explanation as to why the statement or omission complained of was false or misleading." *Cooper v. Pickett,* 137 F.3d 616, 625 (9th Cir.1997) (quoting *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc)); *Sec. & Exch. Com'n v. Levin,* 232 F.R.D. 619, 622–23 (C.D.Cal. 2005). The FCAC provides extensive discussion of the fatal defects in the inhaler's design and trial performance, which explains the falsity of statements that Dura was "on task" to bring the inhaler to the market in late 1998 or early 1999. CW3 observes that the inhaler suffered "significant electro-mechanical problems" during clinical trials, including problems with the circuit board and the battery-operated motor, and a 30% early return rate that well exceeded the industry standard. (FCAC ¶¶ 119, 121.) The Court finds that CW3 is a reliable source of the actual problems in the inhaler's performance during clinical trials because CW3 was thoroughly involved in the "engineering and manufacturing scale-up activities" and drafted sections of the NDA. (*Id.* ¶ 65(c).) Having found that plaintiffs adequately alleged materially false statements beginning in July 1997, the Court proceeds to consider whether plaintiffs have adequately alleged defendants' scienter concerning those statements.

### *3. Scienter*

■ A private securities plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The "required state of mind" is "scienter," *i.e.,* "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Silicon Graphics,* 183 F.3d 970, 975 (9th Cir.1999); *In re Peerless Sys., Corp. Sec. Litig.,* 182 F.Supp.2d 982, 987–88 (S.D.Cal.2002). "[T]he PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *Silicon Graphics,* 183 F.3d at 979; *In re Wet Seal, Inc. Sec. Litig.,* 518 F.Supp.2d 1148, 1157 (C.D.Cal.2007). To satisfy this pleading requirement, "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the defendants knew or were deliberately reckless of the false or misleading nature of the statements when made." *Ronconi v. Larkin,*

---

**10.** Because the Court denies the motion to dismiss the analyst report allegations based on defendants' direct liability for statements made to analysts in connection with a securities transaction, the Court does not address whether defendants placed their "imprimatur" on the reports by adopting analyst projections and forecasts. *In re Dura Pharms., Inc. Sec. Litig.,* 452 F.Supp.2d 1005, 1035–36 (S.D.Cal.2006) (citing *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1115 (D.Nev. 1998)).

253 F.3d 423, 432 (9th Cir.2001); *In re Levi Strauss & Co. Sec. Litig.*, 527 F.Supp.2d 965 (N.D.Cal.2007). As explained *supra*, the Court must consider competing inferences which could be drawn in favor of plaintiffs or defendants and determine whether plaintiffs have pled a "strong inference" of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S.Ct. at 2504–05; *Belizan v. Hershon*, 495 F.3d 686, 691 (D.C.Cir.2007).

Admittedly, the proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1178–79 (C.D.Cal.2007) (quoting *Tellabs*, 127 S.Ct. at 2509). Nonetheless, the Court must discount certain scienter allegations in the FCAC because, in some contexts, the Court finds the sources of those allegations to be unreliable. Because CW6 did not begin work at Dura until after the NDA was filed, the Court finds unpersuasive any allegations concerning events which plaintiffs learned about through CW6 exclusively and which transpired before CW6 became a Dura employee—*e.g.*, the contents of internal reports, the defendants receiving those reports, or extreme-condition tests that senior executives ordered. (*See* FCAC ¶¶ 16–18.) Therefore, the Court discounts the allegation that Ligotke and Gieschen's modification reports were provided to Prettyman and the Regulatory Affairs Department. (FCAC ¶¶ 95, 122.) The allegations concerning the product reports similarly fall by the wayside because CW6 is the source of those allegations and the FCAC inadequately distinguishes the product reports from the modification reports. (*Id.* ¶¶ 16–17.)

Because CW3 is not a reliable source for the fact or substance of meetings among senior management and with FDA officials, the Court discounts those allegations in its scienter analysis. Plaintiffs allege that the product development problems discussed in those meetings eventually resulted in the rejection of the inhaler's NDA. Those allegations would provide evidence of scienter, especially with respect to those discussions held shortly before the NDA filing, when defendants allegedly knew that the problems were so severe as virtually to guarantee the NDA's rejection. However, the Court does not consider these inadequately pled allegations.

■ After discounting the allegations based on unreliable sources, the remaining allegations relevant to scienter include the following. Judge Lorenz previously found that plaintiffs adequately alleged the existence of the Eisele List and its distribution to senior management (including the individual defendants). (Doc. No. 135, at 20:11–14.) The FDA eventually rejected the inhaler NDA application because of, *inter alia*, problems of inhaler reliability and Albuterol stability that were first identified in the Eisele List. (FCAC ¶ 195.) Between these two events, defendants Garner and Prettyman met weekly with the product development team (which included CW3) to review the results from clinical trials and stability tests. (*Id.* ¶ 121.) In one particular meeting in May 1997, Garner specifically asked about the inhaler's reliability and learned that more than 30% of the inhalers failed during clinical trials. (*Id.* ¶ 124.)

Pursuant to the Supreme Court's recent directive, the Court now considers the potential inferences which could be drawn from these scienter allegations—both those that favor plaintiffs, and the "plausible nonculpable explanations" of defendants' conduct, based on these allegations

of scienter. *Tellabs,* 127 S.Ct. at 2510; *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 551 (5th Cir.2007); *Malin v. XL Capital Ltd.,* 499 F.Supp.2d 117, 149 (D.Conn.2007). On the one hand, the Court could infer that the Eisele List put defendants on notice of potential problems with the inhaler. Defendants kept track of those problems by discussing them with engineers during meetings with the product development team. In the end, recognizing that the inhaler would never perform perfectly and the NDA filing would never be totally without risk, the defendants concluded that the likelihood of approval was high enough to go ahead with the NDA. In the dynamic industry of pharmaceutical development, defendants did not have to update investors on all the problems that cropped up along the way, nor should Dura be treated as the insurer of the inhaler NDA.

The inference that favors plaintiffs, however, again begins with the proposition that the Eisele List first put defendants on notice of potential problems with the inhaler. Taken on its own, the Eisele List would not be enough, as defendants received it more than a year prior to the filing of the NDA. (FCAC ¶ 9.) Nonetheless, through the weekly meetings with the product development team, Garner and Prettyman learned that Dura was making essentially no progress in remedying the problems initially identified in the Eisele list. Indeed, Garner specifically inquired about the inhaler's reliability, one of the biggest obstacles to NDA approval. Through these meetings, Garner and Prettyman learned that, *inter alia,* the early return rate for the inhaler was 30%, versus the industry standard of less than 1%. Although certain Dura management officials knew facts that essentially guaranteed the failure of the NDA, Dura continued to represent, both in press releases and to analysts, that it was "on track" to

bring the product to the market in late 1998 or early 1999. A product would not reach the market, however, unless it first obtained FDA approval. Therefore, in summary, the inference favorable to plaintiffs is that Dura represented a specific event—the inhaler reaching the market—at the same time that it knew the necessary prerequisite for that event—FDA approval of the NDA application—would not happen.

The Court finds this inference of scienter to be "cogent and compelling". *See Tellabs,* 127 S.Ct. at 2510. This inference is supported by the length of time that defendants knew about the problems in the inhaler's development, the apparent inability of Dura's product development team to obtain any meaningful improvement in the inhaler performance, the gravity of the problems with the inhaler (including an early return rate more than thirty times the industry standard), the frequency of the product development meetings, Garner's specific inquiry about the inhaler's reliability during one such meeting, and the NDA's failure for the very reasons identified in the Eisele List and discussed during the product development meetings. All these factors make the inference in favor of plaintiffs "at least as compelling" as the opposing nonculpable explanation of defendants' conduct. *Id.*

The Court's finding of adequately pled scienter does not implicate all the individual defendants, however. For example, Newman did not attend the weekly meetings with the product development team—an important part of the scienter inference. Therefore, even though Newman made materially false statements to analysts, those statements are not actionable because the FCAC does not adequately allege Newman's scienter.

■ Even more obviously, the Court must dismiss Spath from the Albuterol Spiros inhaler claim. Spath did not make any of the statements in the press releases or to analysts. To the extent that plaintiffs continue to impute liability based on stock sales, the Court rejects those allegations for the reasons stated in Judge Lorenz's Order on the TAC, which, in turn, cited the Ninth Circuit's agreement with that reasoning. (Doc. No. 135, at 30:18–24.) Plaintiffs' allegations of scheme liability fail on the basis of Supreme Court precedent issued since the parties completed their briefing and oral argument on this motion. In *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, the Court held, "[t]he conduct of a secondary actor must satisfy each of the elements or preconditions for liability." — U.S. ——, 128 S.Ct. 761, 769, 169 L.Ed.2d 627 (2008). Here, plaintiffs have alleged neither that Spath made any materially false statements, nor adequately pled scienter for any statements that Spath might have made. His attendance at senior management meetings does not establish scienter because of the Court's finding that CW3 is not a reliable source for the allegation of what management officials discussed in those meetings or even that these meetings took place.

■ Finally, with respect to Prettyman, the Court has found that CW10 is a reliable source of Prettyman's "involvement" in creating press releases and Dura's rule that all press releases pass through the Regulatory Affairs Department. (*See* FCAC ¶ 22.) The reliability of these allegations, however, does not make them sufficient to satisfy the PSLRA's heightened requirements for pleading scienter. The allegation of Prettyman's "involvement" does not adequately explain the details of that involvement in the creation of press releases, much less his involvement in creating the press releases at issue in this litigation. The key case on which plaintiffs rely, *McConville v. United States Securities & Exchange Commission*, is distinguishable. 465 F.3d 780 (7th Cir.2006). There, the Seventh Circuit denied a petition to review an SEC cease-and-desist order by McConville, a former Chief Financial Officer and corporate controller who violated federal securities laws by causing her employer to file inaccurate financial statements with the SEC. *Id.* at 786. In finding substantial evidence that McConville caused her employer to make material misstatements to investors, the Seventh Circuit cited McConville's drafting and review of financial statements that exaggerated the company's profits, authorship of a letter to the company's accountant representing that the financial statements needed no adjustment for impairment of assets, and reviewed and approved a draft 10–K with the inaccurate financials. *Id.* at 787–88. Compared to the facts of this case, the FCAC's allegations are not sufficiently specific. Plaintiffs conclusorily allege that all the individual defendants were responsible for signing off on Dura's press releases and, in fact, participated in the drafting of those press releases. (FCAC ¶¶ 64, 174.) The Court finds that nonspecific allegations of Prettyman's "involvement" and "participat[ion] in drafting" do not satisfy the PSLRA's heightened requirement for pleading falsity or scienter. To state a viable § 10(b) claim against Prettyman, plaintiffs must provide more details about Prettyman's involvement and participation in drafting press releases, including the specific releases at issue in this litigation.

With respect to the materially false statements, the Court finds that plaintiff has adequately pled scienter with respect to Dura and Garner. The Court now con-

siders whether those statements qualify for the PSLRA's safe harbor provision.

### 4. Applicability of Safe Harbor Provision

The PSLRA's "safe harbor" provision protects from liability a person that makes a "forward-looking statement" where

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or . . .

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir.2004). The definition of "forward-looking statement" includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer[.]" 15 U.S.C. § 78u–5(i)(B). A pre-PSLRA corollary of the "safe harbor" provision is the "bespeaks caution" doctrine, which "provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994).

 Defendants believe that these doctrines apply to the statements in this case. The statements are "forward-looking" in the sense that they talk about a future NDA with the hope of future FDA approval.[11] Defendants included cautionary language in their financial reports throughout the class period (10–K annual reports, 10–Q quarterly filings, etc.). (*See* Defs. Request for Judicial Notice, Exhibit B.[12]) That language expressly disclaimed any assurance that the FDA would approve Dura's products. Furthermore, the language openly conceded that Dura had modified the inhaler system to deal with problems "encountered with the mechanical features . . . during the pivotal trials" and explained that the FDA might require Dura to repeat the clinical trials because of these modifications. (Request for Judicial Notice ("RJN"), Exhibit N,[13] at 25.) The press releases themselves also contain cautionary language, but of a less specific nature. For example, the November 10,

---

**11.** As defendants' materially false statements clearly addressed Dura's "future operations," *i.e.*, its intent to bring the inhaler to market, the Court rejects plaintiffs' argument that the statements related to Dura's current operations. The only statements pertinent to Dura's current operations were reports that Dura completed clinical trials and filed an NDA: these statements were true when made, as the Court found *supra*.

**12.** The Court does not take judicial notice of the exhibit itself, but instead of the underlying SEC filings in which these cautionary statements originally appeared.

**13.** This document is a Form S–1 registration statement that Dura filed with the SEC on October 10, 1997.

1997 press release announcing that Dura filed the NDA contains this disclaimer:

Except for the historical and factual information contained herein, the matters discussed in this press release may contain forward-looking statements which involve risks and uncertainties, including the timely development of the Spiros system, government regulation and dependency upon FDA approval, . . . and other risks detailed from time to time in the Company's filings with the Securities and Exchange Commission.

(RJN, Exhibit Y, at 2.)

The Ninth Circuit has indicated that, even when a forward-looking statement is accompanied by the requisite cautionary language, the speaker may still be liable if the statement is made with actual knowledge, and, where "a strong inference of actual knowledge has been raised," the safe harbor provision would not apply. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936, 937 n. 15 (9th Cir.2003). However, the statement in *America West* was pure dicta, as the court concluded that the corporation's statements did not qualify as "forward-looking statements." *Id.* at 937. Some district courts have contested this statutory interpretation and refused to follow *America West.* Noting that the safe harbor provision is phrased disjunctively, these courts instead hold that the existence of cautionary language precludes an inquiry into the defendant's state of mind. *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1164 (C.D.Cal.2003) (citing legislative history, the Eleventh Circuit, other district courts, and the *Ohio State Law Journal*); *accord In re Portal Software, Inc. Sec.*

*Litig.*, No. C–03–5138 VRW, 2006 WL 2385250 (N.D.Cal. Aug. 17, 2006). Other courts have followed *America West* and held that the speaker of a forward-looking statement may be liable if the statement is made with actual knowledge of its falsity, regardless of any accompanying cautionary statements. *Glenbrook Capital Ltd. P'ship v. Kuo*, 525 F.Supp.2d 1130 (N.D.Cal.2007).

The parties have not cited, nor has the Court found, any subsequent Ninth Circuit authority contradicting the statutory interpretation in *America West.* Therefore, the Court follows the reasoning of *America West.* Because plaintiffs have adequately alleged that defendants Dura and Garner actually knew their statements were false when made, the Court declines to grant the motion to dismiss on the basis of the safe harbor provision.

The Court's decision is also supportable on alternative grounds. Here, the materially false statements appeared in press releases and oral statements [14] to analysts. The meaningful cautionary language, including the warning that the FDA might require additional clinical trials because of Dura's modifications to the inhaler, appeared in SEC filings. The press releases make generic warnings about risks and refer the reader to the Dura's DEC filings. Where a press release "refers to other factors presented in 'SEC filings' that may threaten [a product's] ultimate success", the safe harbor provision does not apply because the corporation "does not specify what these risk factors are, instead leaving investors to obtain these other documents and compare their contents" with the press release.[15] *Immune Response*, 375

---

14. Defendants offer no argument relative to the applicability of the specific safe-harbor exception for forward-looking oral statements. *See* 15 U.S.C. § 78u–5(c)(2).

15. At the motion-to-dismiss phase, the Court declines to find that the allegedly concealed information was already disclosed to the market "with a degree of intensity and credibility

F.Supp.2d at 1035. Applied to these facts, the Court considers only the language in the press releases themselves, not the SEC filings mentioned in those press releases. The press releases refer vaguely to the contingency of FDA approval, but do not disclose the specific clinical trials. Instead, the press releases leave plaintiff investors in the position of having to obtain the SEC filings and compare them with the press releases. The Court declines to apply the safe harbor provision.

### 5. Secondary Liability

The Court finds that, with respect to the Albuterol Spiros inhaler allegations, the FCAC sufficiently states a claim against Newman, Garner, and Spath for controlling person liability under § 20(a) of the Securities Exchange Act of 1934. In so finding, the Court adopts the reasoning of Judge Lorenz's Order previously allowing plaintiffs' § 20(a) claim to go forward against Newman, Garner, and Spath with respect to the TAC's Ceclor CD allegations. (Doc. No. 135, at 36:13–20.)

## C. Ceclor CD

### 1. Prettyman's Liability

The only question relative to the Ceclor CD claim in the present motion is whether plaintiffs have adequately alleged Prettyman's liability for the scheme to overload wholesalers with Ceclor CD to inflate Dura's earnings. For the reasons stated *supra*, the Court dismisses the claim with respect to Prettyman.[16] The Court follows Judge Lorenz's reasoning concerning the

inadequacy of plaintiffs' attempt to impute liability via stock sales, and plaintiffs' "scheme liability" allegations fall short in light of the Supreme Court's opinion in *Stoneridge Investment Partners*. Furthermore, plaintiffs' attempt to state a § 10(b) cause of action for primary liability fails because plaintiffs have pled with insufficient specificity Prettyman's "involvement" and "participation" in drafting the relevant press releases issued by the Regulatory Affairs Department during the class period.

## D. Leave to Amend

" 'Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.' " *Intri–Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1056 (9th Cir.2007) (quoting *Daou*, 411 F.3d at 1013). Here, it is not clear that the remaining deficiencies in the FCAC cannot be saved by an amendment. Therefore, the Court gives plaintiffs a final opportunity to amend.

## CONCLUSION

Concerning the allegations regarding the Albuterol Spiros inhaler, the Court **ORDERS** as follows:

—The Court **denies** the motion to dismiss the first cause of action with respect to defendants Dura and Garner. The Court **grants** the motion to dismiss the first cause of action with respect to Newman, Spath, and Prettyman.

---

sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir.1996) (internal quotation omitted). The Court further finds that defendants' representations of being "on track" to bring the inhaler to market (even though defendants allegedly knew that the inhaler would not be able to obtain the pre-

requisite FDA approval) are sufficiently specific to avoid dismissal as non-actionable puffery.

16. The analysis for Prettyman's liability with respect to the Albuterol Spiros allegations is virtually indistinguishable from the liability analysis on the Ceclor CD claim.

—The Court **denies** the motion to dismiss the second cause of action with respect to all defendants named in that cause of action—Newman, Garner, and Spath.

Concerning the allegations regarding the Ceclor CD claim, the Court **GRANTS** the motion to dismiss the first cause of action with respect to defendant Prettyman.

Within thirty days of the date that this Order is electronically docketed, plaintiffs **MAY FILE** an amended complaint that addresses the deficiencies in pleading discussed above.

If plaintiffs do not file an amended complaint in the time so provided, the FCAC shall proceed against defendants with respect to the Ceclor CD allegations as outlined in Judge Lorenz's Order on the TAC. With respect to the Albuterol Spiros inhaler allegations, the FCAC's first cause of action shall proceed against defendants Dura and Garner to the extent consistent with the reasoning of this Order, and the second cause of action shall proceed against defendants Garner, Newman, and Spath.

Should plaintiffs not file an amended complaint, defendants **SHALL FILE** an Answer to the FCAC within 45 days of the date that this Order is stamped "Filed."

IT IS SO ORDERED.