# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3510

RITA J. MCCONVILLE,

*Petitioner,*

*v.*

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

*Respondent.*

Petition for Review of an Order of the
Securities and Exchange Commission.
No. 3-11330

ARGUED FEBRUARY 14, 2006—DECIDED OCTOBER 11, 2006

Before BAUER, RIPPLE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* "'There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy.'" *Basic Inc. v. Levinson,* 485 U.S. 224, 230 (1988) (quoting H.R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934)). This case involves mismanagement of a corporation's financial department that eventually caused it to report its financial health inaccurately. The United States Securities and Exchange Commission ("SEC" or "Commission") determined that, during her tenure as chief financial officer for Akorn Incorporated ("Akorn"), Rita McConville caused Akorn to make misleading financial statements to

investors. The Commission concluded McConville's conduct violated, among other things, Sections 10(b), 13(b)(2) and 13(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and ordered her to cease and desist from committing or causing any further violations of federal securities laws. McConville now petitions us to review the Commission's cease-and-desist order. For the reasons that follow, we deny the petition for review.

## I. BACKGROUND

### A. *Akorn's Financial Reports and SEC Filings*

Akorn is a corporation that manufactures and sells diagnostic and therapeutic pharmaceuticals. During the time relevant to this proceeding, Akorn's customers included both pharmaceutical wholesalers and direct or end-use customers. However, the company's profits were primarily from five major wholesale customers, which amounted to approximately 43% of its total sales and 60% of its gross accounts receivable as of December 31, 2000. Akorn's customers would generally order products and be invoiced according to varying rates, corporate credits, and payment schedules. Invoices were typically twenty to thirty pages long. Payment schedules varied between thirty and ninety days, with larger wholesalers generally enjoying longer payment terms than direct customers. Akorn classified its payment schedules as current, thirty to sixty days past due, sixty to ninety days past due, and over ninety days past due. Akorn, however, did not charge interest on overdue bills, thus minimizing the incentive for customers to remit payments in a timely manner. A customer payment to Akorn was accompanied by a remittance advice of up to 400 lines in length. A remittance advice explained the payment and, in some instances, asserted claims for a variety of credits that could apply to the order.

In the late 1990's, Akorn's invoicing system was a labyrinth in which the company billed customers and processed

cash remittances and credit claims against invoices at three different finance offices that used different computer programs and record-keeping mechanisms. In 1999, in an effort to centralize its finance, billing, and accounts receivable records, Akorn began using a software program called Macola. Akorn's use of Macola was short-lived, as the software proved incapable of tracking the age of Akorn's outstanding invoices, monitoring debits and credits applied to a particular customer account, and handling high-volume data management. In 2000, Akorn began using a J.D. Edwards software package. Rather than migrating its billing files from the Macola software to the J.D. Edwards software, Akorn recorded new receivables on the J.D. Edwards software, but the company did not transfer the existing Macola-tracked accounts. The result was a parallel system of bill tracking that used two different software modules.

Petitioner Rita McConville served as chief financial officer ("CFO") for Akorn from February 28, 1997 to March 20, 2001. As CFO, McConville reported to Akorn's president and chief executive officer ("CEO"), Floyd Benjamin. McConville supervised Akorn's corporate controller and its finance departments, and she worked with Akorn's auditor, Deloitte & Touche LLP ("Deloitte"). As CFO, McConville was also, along with Akorn's corporate controller, responsible for filing Akorn's financial documents with the SEC.

On February 25, 2000, Akorn's auditor, Deloitte, sent a letter to its board of directors, alerting the board to anticipated problems in Akorn's financial statements for the fiscal year ending on December 31, 1999. The report identified as particularly problematic Akorn management's failure to review the accounts receivable in detail, misapplication of credits and payments to customer accounts, and failure to collect outstanding balances effectively and efficiently. The report also included a section entitled "Management Response," which was drafted in part by

McConville, stating that management had begun an effort to reconcile all customer accounts, with a goal of "significant collection resolution by June 30, 2000 and complete cleanup by August 31, 2000."

Later in 2000, the disarray in Akorn's financial department boiled over when a billing discrepancy arose between Akorn and its largest customer, Cardinal Health Incorporated, which represented 12% of Akorn's net sales and 22% of its gross accounts receivable. Akorn's records (based on invoices going back to 1999 when the Macola software was used) showed that Cardinal owed Akorn approximately $4 million. Cardinal's records showed that it had a credit balance with Akorn of approximately $800,000, meaning the variance in the companies' books differed by nearly $5 million. The chairman of Akorn's board of directors and a major stockholder, John Kapoor, instructed McConville and the corporation's CEO to meet with Cardinal and resolve the billing dispute. McConville took copies of the largest outstanding invoices to the meeting with Cardinal, leaving behind the invoices with smaller balances.[1]  During the meeting, McConville presented only the larger outstanding invoices to Cardinal for payment. After the meeting, Cardinal sent Akorn $ 913,000, which it viewed as full payment to settle any debt it owed and creating a credit balance with Akorn. Akorn, on the other hand, believed that many outstanding Cardinal invoices remained unpaid, and a March 15, 2001 letter from CEO Benjamin to Cardinal stated that there was still a discrepancy of more than $5 million to be reconciled between the Akorn records and the Cardinal records. (It is unclear from the record how the

---

[1] McConville testified that she believed she took only invoices for more than $10,000 to the meeting with Cardinal. The Commission, however, noted other evidence in the record suggesting that the invoices McConville presented at the meeting were only those with balances of more than $ 50,000.

discrepancy of just under $5 million before the meeting jumped to over $5 million after the meeting).

Notwithstanding the lingering dispute between Cardinal and Akorn over the amount of Cardinal's outstanding balance, if any, McConville reassured Akorn's auditor Deloitte that the customer accounts were successfully being reconciled and that there was little past due money owing from wholesalers because most of the aging balances were offset by more recent credits.[2] McConville also wrote a press release, dated February 20, 2001, announcing an approximate $ 2 million profit in Akorn's fourth-quarter results. During February and early March, McConville also reviewed drafts of the 2000 financial statements.

Still not satisfied with Akorn's financial condition, Kapoor assigned McConville to work with a consultant hired by Kapoor to conduct a thorough analysis of Akorn's accounts receivable and to submit a report discussing any potential write-offs of the receivables. On March 15, 2001, the consultant submitted a report to Kapoor, stating, in relevant part:

> **The wholesaler accounts have never been worked.** We are talking about an accumulation of problems over a 3 or 4 year period. This provides us with a legacy of pages and pages of A/R[3] reports on each of those five accounts, consisting of a maze of transactions including: open invoices, partially paid invoices, billbacks, credits for return goods, credits for damaged goods, credits for shipments not received, credits for billing errors, rebate credits,

---

[2]   Joint Appendix at 413, *McConville v. SEC*, No. 05-3510 (7th Cir. Nov. 17, 2005).

[3]   "A/R" in the consultant's report is shorthand for "accounts receivable."

chargeback credits, deductions taken arbitrarily by
the wholesaler, situations where the wholesaler
used credits multiple times, and unapplied cash.
These transactions go back as far as 1996.

(Emphasis in original). The consultant further concluded
that "there [we]re no quick fixes available" because "[n]o
management reports exist that trend sales, cash, A/R aging,
reserves, unbilled, or [days sales outstanding]. Therefore,
the A/R could not have been properly monitored." At the
end of the day, the consultant concluded that "a determina-
tion on the collectibility will require a substantial amount
of time (months) and work." Although Kapoor instructed
McConville to work with the consultant, McConville
maintains that she never viewed the report or discussed its
contents before it was submitted to the board of directors.

On March 20, 2001, Akorn's board of directors removed
McConville from her position as CFO, and demoted her
to corporate controller.[4] As part of her new duties,
McConville reported to incoming CFO Kevin Harris, and
she was tasked with resolving the billing dispute with
Cardinal. McConville also continued her work, the degree
to which is disputed by the parties, compiling the figures for
Akorn's 2000 fiscal year audit for the financial statements
that would be filed with the SEC. What is apparent from
the record is that McConville's input in the fiscal year 2000
financial statements began while she was CFO of Akorn.[5]

---

[4] Also on March 20, 2001, the board of directors demoted
Akorn's CEO Floyd Benjamin to vice president, and Kapoor
became the interim CEO.

[5] McConville concedes that she had some input in drafting the
financial statements while she was CFO, but she contends that
the preparation of Akorn's Form 10-K did not begin in earnest
until after she was removed as CFO. McConville contends that her

(continued...)

As stated, during her tenure as CFO, McConville frequently reassured Akorn's auditor, Deloitte, that the books would eventually balance out. She also regularly met with Deloitte representatives and reviewed preliminary draft figures for the financial statements. According to the Commission's findings, by McConville's last day as CFO on March 20, the financial statements were largely completed, and a draft of the 2000 Form 10-K, a document reporting a corporation's financial health to the SEC, had already been prepared. The Commission also found that, as CFO, McConville reviewed a draft of the 2000 Form 10-K, the filing of which was delayed due to the consultant's investigation.[6]

McConville, among others, signed two management representation letters in connection with Deloitte's annual audit of the financial statements filed with the 2000 Form 10-K. The first letter, dated February 23, 2001, stated that, to the best of McConville's knowledge: (1) other than those disclosed, no events had occurred subsequent to December 31, 2000 that required consideration as adjustments to or disclosures in the consolidated financial statements; (2) management believed the credit allowances were adequate to absorb currently estimated uncollectible receivables in the account balances; and (3) management had reviewed the financial statements for

---

[5] (...continued)
involvement in drafting the Form 10-K was limited to preparing a single footnote pertaining to the corporation's stock options.

[6] McConville contends that she did not see a draft of the 2000 Form 10-K during her tenure as CFO. However, the Commission deferred to the administrative law judge's finding that McConville's testimony to that effect was incredible, and that she did in fact review a draft of the Form 10-K while she was CFO. And, as we explain below, our review of the Commission's finding is highly deferential.

impairments of Akorn's assets, and no adjustment to the statements was required.[7] Notably, McConville admits that the task of resolving the Cardinal billing dispute was "far from complete on April 17, 2001."[8] However, the second letter she signed, dated April 17, 2001, stated that "there are no events which have occurred subsequent to February 23, 2001 that have a material effect on the financial statements that are in the filing or that should be disclosed in order to keep those statements from being misleading."[9] That same day, Akorn filed the 2000 Form 10-K with the SEC, reporting a net income of $2,187,000, current assets of $42,123,000 (as of December 31, 2000), and accounts receivable of $24,144,000, which amounted to approximately 57% of Akorn's then-current assets. McConville did not sign the Form 10-K.

On May 22, 2001, a month after filing the Form 10-K, Akorn filed its quarterly report, Form 10-Q, for the quarter that ended on March 31, 2001. In its Form 10-Q, Akorn increased by $7.5 million its allowance for doubtful accounts, that is accounts with balances unlikely to be recovered. McConville's employment with Akorn terminated in July 2001. Over a year later, on October 7, 2002, Akorn restated its financial statements for 2000 and 2001 by filing a Form 10-K/A. The Form 10-K/A stated that Akorn "had not adequately considered all of the information available with respect to certain disputed receivables in establishing its allowance for uncollectible accounts as of December 31, 2000," and the $7.5 million increase in its allowance for

---

[7] Joint Appendix at 388-392, *McConville v. SEC*, No. 05-3510 (7th Cir. Nov. 17, 2005).

[8] Brief of Petitioner-Appellant at 19, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

[9] Joint Appendix at 396, *McConville v. SEC*, No. 05-3510 (7th Cir. Nov. 17, 2005).

doubtful accounts should have been recorded at the end of 2000, rather than in the 2001 Form 10-Q. At the end of the day, once the financial statements were corrected, Akorn sustained a net loss of $2.4 million in 2000, rather than a gain of $2 million as it had originally reported in its Form 10-K.

### B. SEC Proceedings

On November 12, 2003, the SEC instituted proceedings against McConville and Akorn CFO Harris. The SEC alleged that, as CFO, and later as corporate controller, McConville's mismanagement of Akorn's financial department caused the corporation to file inaccurate financial statements with the Commission in violation of federal securities laws. An administrative law judge ("ALJ") determined that McConville and Harris were liable, and the ALJ ordered McConville to cease and desist and to disgorge nine months of her Akorn salary. On review, the Commission largely agreed with the ALJ's decision, finding the footnotes to the Form 10-K should have reported an unquantifiable impairment in Akorn's accounts receivable and that McConville lied to Deloitte about the financial health of the company, which she failed to monitor properly. The SEC concluded that McConville's conduct violated Sections 10(b), 13(b)(2) and 13(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78m(b)(5), as well as SEC Rules 13b2-1 and 13b2-2. And, although the Commission believed disgorgement was unwarranted, it ordered McConville to cease and desist from further securities violations. This petition for review followed.

## II. ANALYSIS

The Securities Exchange Act of 1934, 15 U.S.C. § 78y (2000), requires us to give highly deferential, conclusive

effect to the Commission's factual findings, so long as they are supported by substantial evidence in the record. *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2004). As a congressionally authorized administrative agency, the Commission's interpretation of the Securities Exchange Act will be upheld, unless the interpretation is contrary to clear congressional intent. *United States v. Mead Corp.,* 533 U.S. 218, 227 (2001); *see also Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 843-45 (1984). In addition, the Commission's interpretation of its own regulations promulgated pursuant to the Act will be upheld, unless the regulations are arbitrary, capricious, or manifestly contrary to the statute. *Chevron,* 467 U.S. at 844.

### A.  There is Substantial Evidence that McConville Violated SEC Rule 10b-5.

Under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 77j(b), promulgated as Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, the Commission must show that McConville  (1)  made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities. *SEC v. Maio*, 51 F.3d 623, 630 (7th Cir. 1995).

As an initial matter, we briefly address McConville's argument that she cannot be primarily liable for the misstatements in Akorn's 10-K because her significant participation in creating the corporate misstatements cannot form the basis for Rule 10b-5 liability.[10] McConville's argument is essentially that despite her substantial involvement in drafting the financial statements, their subsequent fraud on the market cannot be attributed to her

---

[10] Brief of Petitioner-Appellant at 34, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

because she did not sign or physically file the Form 10-K. This circuit long ago rejected McConville's literal interpretation of Rule 10b-5's antifraud provision. *See SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982). In *Holschuh*, a corporate officer provided materially misleading information that was ultimately incorporated into offering circulars given to potential investors. The officer argued that Rule 10b-5 liability could not be imposed against him because he had no direct contact with investors or editorial control over the contents of the offering circulars. We disagreed, holding that "actual or first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations," so long as the requisite intent was established. *Id.* at 142.

As to the merits of the case against McConville, the SEC concluded the following:

> The violations here were significant. McConville was responsible for misrepresentations and omissions in Akorn's Form 10-K, which was filed with the Commission and thus made available to investors. As a result of the deficiencies in Akorn's recordkeeping and internal controls, Akorn's receivables were overstated, no impairment of the receivables was disclosed, and no reserve was created for customer accounts that represented 60% of the receivables. McConville made misrepresentations to Deloitte in the management representation letters to Deloitte, knowing that Deloitte would be basing assumptions on those letters in its work on the 2000 audit.[11]

We now consider whether there is substantial evidence to support the Commission's finding that, with the requisite

---

[11] *In re Rita v. McConville*, Exchange Act Release No. 51950, 2005 WL1560276 at *15 (June 30, 2005).

scienter, McConville breached a duty to disclose an unquan-tifiable impairment in Akorn's accounts receivable. Given that the loss to Akorn's investors was inevitable when the Form 10-K was filed, and only the magnitude of the loss was uncertain, as discussed below, we conclude McConville's failure to disclose the impairment in Akorn's financial statements violated Rule 10b-5.

McConville argues that the Commission's findings regarding the first and third elements of Rule 10b-5 liability are not supported by substantial evidence. Regarding the first factor (whether she made or, more precisely, caused Akorn to make material misstatements to investors), McConville argues that the SEC's findings are not sup-ported by substantial evidence because she had no obliga-tion to file or cause the Form 10-K to be filed.[12] This argument misses the point, however. As we have stated, the issue is not whether McConville (quite literally) delivered the misleading statements to the SEC, but whether she caused Akorn to make material misstatements to the investing public. Importantly, McConville does not dispute three critical facts that are fatal to her argument: (1) she drafted and reviewed the core financial statements that overestimated Akorn's profits; (2) in February 2001, she reviewed and approved a draft of the Form 10-K that consisted of the inaccurate core financial statements;[13] and (3) in a February 23, 2001 letter to Deloitte, McConville represented that management had reviewed the financial statements for impairments of Akorn's assets, and that no

---

[12] Brief of Petitioner-Appellant at 30, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

[13] Notably, the Commission found that the Form 10-K that was ultimately filed with the SEC was virtually identical to the draft McConville reviewed while still CFO of Akorn. Brief of Petitioner-Appellant, appendix at 14, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

adjustment to the statements was required. McConville also attempts to wash her hands of the misstatements, arguing her involvement with Akorn's financial statements ceased after she prepared the February 20, 2001 press release announcing Akorn's 2000 earnings were approximately $2 million. Here again, the record belies McConville's argument. In Akorn's April 17, 2001 letter to Deloitte, McConville represented that there were no events to occur subsequent to February 23, 2001 that materially affected the financial statements that were in the Form 10-K filing or that should be disclosed in order to keep those statements from being misleading. Thus, the same day the SEC filing was disseminated to investors, McConville represented to Akorn's auditor that the financial statements that she compiled were accurate. Therefore, we conclude that her substantial involvement in compiling the misleading statements and her reassuring Akorn's auditors as to their accuracy is substantial evidence to establish that McConville made a false statement or omission.

As to the third element (whether McConville acted with scienter), we also conclude that the Commission's finding was supported by substantial evidence. The requisite scienter is "an extreme departure from the standards of ordinary care, [ ] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 600 (7th Cir. 2006) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

McConville's conduct was an extreme departure from the requisite standard of ordinary care because she was well aware that Akorn's financial department was in critical disarray, and she failed to disclose inevitable problems in the financial statements. In light of Deloitte's February 25, 2000 letter raising concerns about mismanagement of the department, McConville responded that management had begun an effort to reconcile all customer accounts, with a

goal of "significant collection resolution by June 30, 2000 and complete cleanup by August 31, 2000." That goal was never met. McConville was also aware that there was an ongoing $5 million dispute between Akorn and its biggest customer, Cardinal. Most importantly, McConville knew that resolving the Cardinal billing dispute was "far from complete on April 17, 2001."[14] Yet, the very day when the Form 10-K was filed, she nonetheless represented to Akorn's auditors that "there are no events which have occurred subsequent to February 23, 2001 that have a material effect on the financial statements that are in the filing or that should be disclosed in order to keep those statements from being misleading."[15] Thus, there is substantial evidence in the record to support the Commission's finding that McConville's conduct (at least) occurred with recklessness. *Makor,* 437 F.3d at 600; *Sundstrand*, 553 F.2d at 1045.[16]

### B. There is Substantial Evidence that McConville Violated SEC Rules 13b2-1 and 13b2-2.

McConville also challenges the Commission's finding that she violated SEC Rules 13b2-1 and 13b2-2. Both of these findings are supported by substantial evidence, however. Rule 13b2-1 provides: "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities

---

[14] Brief of Petitioner-Appellant at 19, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

[15] Joint Appendix at 396, *McConville v. SEC*, No. 05-3510 (7th Cir. Nov. 17, 2005).

[16] For reasons similar to why we conclude there is substantial evidence to support the Commission's finding that McConville violated Rule 10b-5, we conclude there is substantial evidence to support its finding that she violated Section 13(a) of the Act and SEC Rules 13a-1 and 12b-20.

Exchange Act." 17 C.F.R. § 240.13b2-1 (2006). In its opinion, the SEC found that "Akorn's accounts receivable did not accurately show what invoices had been paid or what amounts were still owing on particular invoices and therefore did not accurately and fairly reflect the transactions and dispositions of Akorn's assets."

McConville argues that there is no evidence of her scienter to violate Rule 13b2-1. However, the Commission has previously stated that there is no scienter requirement in SEC Rule 13b2-1 because § 13(b) of the 1934 Securities Exchange Act "contains no words indicating that Congress intended to impose a 'scienter' requirement." Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 34,15570, 16 SEC Docket 1143, 1151 (February 15, 1979). As we have stated, the Commission's interpretations of its own regulations are entitled to deference as long as, as in this case, the interpretation is not arbitrary, capricious, or manifestly contrary to the statute. *See, e.g., Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984) (courts must give deference to administering agency's reasonable statutory interpretations). Because scienter is not required under the Rule, and because there is otherwise substantial evidence of liability in the record, we will not reverse the SEC's finding that McConville violated Rule 13b2-1.

The Commission's finding that McConville violated Rule 13b2-2 is also supported by substantial evidence. Rule 13b2-2 provides: "No director or officer of an issuer shall, directly or indirectly: (1) make or cause to be made a materially false or misleading statement to an accountant in connection with . . . (i) [a]ny audit, review or examination of the financial statements of the issuer. . . ." 17 C.F.R. § 240.13b2-2. For the reasons already explained in our discussion of her Rule 10b-5 argument, we reject McConville's argument that there is not substantial

evidence supporting the Commission's conclusion that she lied to Deloitte in the two management representation letters she signed. Particularly, McConville knew the Cardinal dispute over $5 million was unresolved when she signed the representation letters, reassuring Deloitte that the financial statements were accurate.

**C.** ***There is Substantial Evidence that McConville Violated Sections 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the 1934 Securities Exchange Act.***

Section 13(b)(2)(A) of the Securities Exchange Act requires an issuer of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. . . ." The Commission concluded that as CFO, McConville caused Akorn to violate Section 13(b)(2)(A) of the Act. McConville now argues that she cannot be liable for causing the Section 13(b)(2)(A) violation "because the Commission cannot identify any evidence suggesting she was responsible for the maintenance and upkeep of Akorn's book's and records."[17] This argument is without merit. As chief financial officer, McConville's very job at Akorn was to manage its financial department and ensure its records and accounts were accurately and fairly maintained, and there is substantial evidence that she failed to do so. The record indicates that Akorn's financial records were in an ongoing state of disarray. By spring 2001, the wholesaler accounts (which were the bulk of Akorn's sales) had never been reconciled; and there was an accumulation of problems over a three or four year period. Even McConville admits that the reconciliation process in Akorn's financial department was continu-

---

[17] Brief of Petitioner-Appellant at 45, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

ing when her employment terminated in July 2001.[18] We affirm the SEC's conclusion that she caused Akorn to violate Section 13(b)(2)(A) of the Act.

McConville also challenges the Commission's conclusions that she violated Sections 13(b)(5) and 13(b)(2)(B) of the Act, which require corporations to implement and maintain internal accounting controls. Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors.[19] For reasons similar to why we affirm the Commission's Section 13(b)(2)(A) finding, we likewise conclude there is substantial evidence that McConville failed to implement and maintain internal accounting controls at Akorn in violation of Section 13(b)(5).

## III.  CONCLUSION

Accordingly, for the reasons set forth in this opinion, the petition for review is DENIED.

---

[18] Brief of Petitioner-Appellant at 19, *McConville v. SEC*, No. 05-3510 (7th Cir. Dec. 6, 2005).

[19] *See In re Albert Glenn Yesner, CPA*, Initial Decision, Exchange Act Release No. 184, 2001 WL587789 at *33 (May 22, 2001) (citing STATEMENT ON AUDITING STANDARDS No. 55 ¶ 32, CONSIDERATION OF INTERNAL CONTROL IN A FINANCIAL STATEMENT AUDIT (1998). VINCENT M. O'REILLY ET AL., MONTGOMERY'S AUDITING 9-7 through 9-10, 9-13 through 9-14 (12th ed. 1988)).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*