# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-2780

_____

Securities and Exchange Commission

*Plaintiff - Appellee*

v.

Rajnish K. Das

*Defendant*

Stormy L. Dean

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 16, 2013
Filed: July 29, 2013

_____

Before SHEPHERD, BEAM, and MELLOY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Vinod Gupta lived a life of luxury as the chief executive officer of infoUSA, Inc. From frequent private-jet travel to payments and upkeep for the *American Princess*, his 80-foot yacht, infoUSA reimbursed Gupta, or one of his separate

business entities, for a wide variety of expenditures. This arrangement effectively allowed Gupta to reap the benefits of additional income without paying additional income taxes. For some infoUSA employees, this was acceptable because infoUSA was viewed as Gupta's company—he started it, engineered its growth, and had significant influence with the board of directors. The Securities and Exchange Commission ("SEC") had a different perspective because infoUSA was a publicly traded corporation owned by its shareholders.

As a result of these transactions and reimbursements, the SEC brought a civil enforcement action against former infoUSA chief financial officers ("CFO") Rajnish Das and Stormy Dean, alleging they violated provisions of the Securities Exchange Act of 1934 (the "Exchange Act"). This appeal concerns only Stormy Dean. After a ten-day trial, a jury found that Dean violated various securities laws, and the district court imposed several civil penalties. Dean now appeals, challenging the district court's handling of the trial, its post-trial findings, and the sufficiency of the evidence against him. We affirm the matter in all respects but one, and remand the case for further proceedings.

## I. Background and Procedural History[1]

Headquartered in Omaha, Nebraska, infoUSA was a publicly traded corporation that sold business and consumer databases. Gupta founded infoUSA's predecessor company in 1972 and served as its CEO and chairman until 2008. Dean began working in infoUSA's accounting department in 1995. He served as infoUSA's CFO from January 2000 to October 2003, and again from February 2006 to December 2008.

---

[1]"We recite the relevant facts in the light most favorable to the jury's verdict." Quigley v. Winter, 598 F.3d 938, 944 n.2 (8th Cir. 2010).

The SEC made an informal inquiry into infoUSA's activities in late 2007, following a separate lawsuit that infoUSA's shareholders brought against the board of directors in Delaware.[2]  As a result of the SEC inquiry, infoUSA's board of directors formed a director-led committee, and with the assistance of outside legal counsel and forensic accountants, it investigated allegations of improper related-party transactions and misuse of corporate assets.

In 2010, the SEC brought this civil enforcement action against Dean and Das. In the complaint, the SEC asserted the following seven claims against Dean:

(1) Securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

(2) Soliciting false proxy statements in violation of Section 14(a) of the Exchange Act and Rule 14a-3 and 14a-9.  15 U.S.C. § 78n(a); 17 C.F.R. §§ 240.14a-3 and 14a-9.

(3) Falsifying books, records, or accounts in violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1. 15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1.

(4) Certifying false reports filed by infoUSA in violation of Rule 13a-14 of the Exchange Act.  17 C.F.R. § 240.13a-14.

(5) Deceiving auditors in violation of Rule 13b2-2 of the Exchange Act.  17 C.F.R. § 240.13b2-2.

(6) Aiding and abetting infoUSA in filing false SEC filings in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1.  15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20 and 240.13a-1.

---

[2]See In re infoUSA, Inc. Shareholders Litig., 953 A.2d 963 (Del. Ch. 2007).

(7) Aiding and abetting infoUSA in falsifying books and records in violation of Section 13(b)(2) of the Exchange Act. 15 U.S.C. § 78m(b)(2).

For relief, the SEC requested that the court enjoin Dean from violating the provisions outlined in the complaint, order civil penalties, permanently prohibit Dean from serving as an officer or director of any publicly traded company, and grant such other relief the court deemed just or appropriate.

At trial, the SEC presented substantial evidence to support its claims that infoUSA failed to report related-party transactions[3] and the perquisite benefits[4] Gupta received. The SEC called eighteen witnesses, including Dean. The SEC also presented an expert witness, Dr. Steven Henning, a partner of a financial advisory firm, licensed certified public accountant, and former professor. Henning testified that after independently reviewing infoUSA's filings, he believed the filings did not adequately disclose perquisites or related-party transactions. The SEC introduced flight logs of private-jet travel, credit card statements, Dean's calendar, and invoices from separate business entities wholly owned by Gupta. The jury heard that infoUSA reimbursed Gupta's private-jet travel, yacht payments and expenses, portions of his wedding in South Africa, luxury cars, a home in California, membership dues to approximately thirty private country clubs, and personal life insurance policies. Additionally, infoUSA made payments for some of these expenses by reimbursing Annapurna and Aspen Leasing, businesses Gupta owned. According to the SEC's expert, infoUSA reported zero perquisite compensation related to these personal benefits.

---

[3]SEC regulations require disclosure of related-party transactions in SEC filings, including proxy statements or a Form 10-K. See 17 C.F.R. § 229.404.

[4]Because infoUSA was a publicly traded corporation, it was required to file reports regarding executive compensation, including disclosure of perquisites and personal benefits. See, e.g., 17 C.F.R. § 229.402.

The SEC also presented evidence that Dean knew these payments should have been reported in infoUSA's filings, which Dean certified. When Michael Schultz, infoUSA's chief accounting officer, raised the issue of sorting Gupta's business and personal expenses, Dean told him, "we don't do that here." Further, Dean had issued a press release in which he stated he "considered some of the expenditures entirely wrong."

Dean's trial was consolidated with that of Das, who served as infoUSA's CFO from 2003 to 2006. At the close of the SEC's case, Dean moved for judgment as a matter of law; the district court denied the motion. Das then presented two witnesses, but no expert. Dean presented no witnesses or other evidence. After closing argument, the jury deliberated for a few hours and returned a verdict, finding in favor of the SEC on every claim.

The SEC subsequently moved for remedial relief and entry of judgment against Dean. The district court sua sponte ordered that the parties address whether the court could order Dean to pay restitution to infoUSA, whether that restitution should take precedence over a civil penalty, and "whether any supersedeas bond posted by Defendants in the event of an appeal should cover Defendants' obligation for such restitution as well as for any civil penalty." The district court also asked Dean to address whether, "under applicable law or under contract," he had a right to seek indemnification from infoUSA for the civil penalties imposed. After considering these issues, the district court permanently enjoined Dean from committing further securities violations, enjoined Dean from acting as an officer or director of a publicly traded company for three years, imposed a $50,000 civil penalty, and noted that Dean had "acted in bad faith toward" infoUSA's shareholders. Finally, although the court did not order Dean to pay infoUSA restitution for attorney fees and expenses, it did bar Dean "from seeking payment, reimbursement, or indemnification from any third party, including Info, for the civil penalties ordered herein." Dean now appeals.

## II. Analysis

Dean raises four argument on appeal: (1) there is insufficient evidence presented to support the jury's findings; (2) the district court erred by admitting the testimony of the SEC's expert witness; (3) the district court abused its discretion in instructing the jury; (4) the district court erred by finding that he acted in bad faith toward infoUSA's shareholders.

## A. Sufficiency of the Evidence

Dean contends the district court should have granted judgment as a matter of law because the SEC failed to establish the standard of care that Dean was required to follow as CFO. The SEC responds that because Dean failed to renew his motion for judgment as a matter of law, he waived the argument. "[A] party is not entitled to pursue a new trial on appeal unless that party makes an appropriate postverdict motion in the district court." Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 404 (2006). This rule applies equally whether a party on appeal is seeking judgment as a matter of law or a new trial. Id. at 402. Courts have uniformly applied but limited the Unitherm holding "to sufficiency of the evidence challenges where parties fail to file a postverdict motion under Rule 50(b) after the *denial* of a Rule 50(a) preverdict motion." Linden v. CNH Am., LLC, 673 F.3d 829, 833 (8th Cir. 2012).

Dean concedes that he failed to file a Rule 50(b) motion after the jury returned its verdict. Dean instead argues that his case is an exception to Unitherm because in a postverdict order, the district court addressed the evidence against Dean and concluded it supported the jury's verdict. Although the district court did generally acknowledge that sufficient evidence existed, it did not engage in any analysis relating to the argument that Dean now raises on appeal—specifically, that the

-6-

government failed to adequately prove the standard of care he should have observed as CFO. Therefore, we conclude that Dean cannot now challenge the sufficiency of the evidence against him because he failed to file a postverdict motion under Rule 50(b) after the district court denied his Rule 50(a) motion. See Unitherm, 546 U.S. at 404; Linden, 673 F.3d at 833.

## B. Expert Witness Testimony

Next, Dean raises two claims with respect to Dr. Steven Henning's expert testimony that, according to Dean, demonstrate the district court abused its discretion by allowing Henning to testify. First, Henning failed to consider whether his findings of error were within the zone of reasonableness when compared to infoUSA's actual filings. Second, Henning relied upon a different standard than the standard established by the SEC for determining whether an expense was a perquisite or a business expense. We review a trial court's decision to admit expert testimony for abuse of discretion. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Dr. Henning testified to assist the jury in determining whether infoUSA misstated perquisite compensation paid to Gupta and related party transactions involving Gupta's separate business interests. Under the Federal Rules of Evidence, expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule imposes a requirement on the district court to perform a gate-keeping function. Smith v. Cangieter, 462 F.3d 920, 923 (8th Cir. 2006).

Henning testified that infoUSA under-reported perquisite compensation in the amount of $2,153,700 in 2003 and $1,320,500 in 2006. Henning testified that from 2003 through 2006 infoUSA disclosed zero perquisites related to travel on private jets, the 80-foot yacht, credit card expenses, club memberships, vehicles, private residences, and life insurance policies. Although Henning found that Gupta's perquisite benefits were underreported, he testified that the majority of the expenses Gupta charged infoUSA were proper business expenses. Henning also testified that infoUSA did not adequately disclose related-party transactions in the amount of $1,955,000 in 2003.

### 1. Rate of Error

Dean first contends that Henning's testimony was not helpful to the jury because Henning failed to calculate whether an error rate existed between what Henning concluded should have been reported and what infoUSA originally reported. According to Dean, "[s]imply providing an alternative calculation, with no explanation for the differences . . . did not help the jury do anything more than guess about the differences." To support this argument, Dean also asserts that Henning failed to consider relevant facts associated with the case.

Aside from calculating an error rate, however, it is not clear what facts Dean contends Henning failed to consider that render his expert opinion invalid. Henning testified regarding his analysis of federal securities-reporting requirements and infoUSA's documentation. Cf. Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000) (finding CPA was proper expert witness regarding damages calculations, because "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert

witness"). Henning testified that for several broad categories, including jet travel, cars, residences, credit cards, and yachts, infoUSA reported *no* perquisite compensation to Gupta. Henning's conclusions benefitted the jury: they assisted the jury in understanding how a professional financial officer or auditor would analyze whether a benefit was personal or business, as well as Henning's application of that analysis to the facts of this case.

During closing arguments, Dean's counsel told the jury, "You can trust [Henning] if you want. That is within the scope of what a jury can do." We agree. Henning's testimony, even without calculating an error rate, assisted the jury in understanding whether a benefit should be considered a perquisite, and synthesized the extensive documentation that spanned a period of several years.

2. Methodology

Next, Dean asserts that Henning erroneously relied upon an incorrect standard for determining whether an expense was a perquisite. More specifically, Dean argues that Henning used the IRS's "primary-purpose" test rather than the SEC's "integrally-and-directly-related" test when determining whether Gupta's expenses were perquisites. The SEC has promulgated guidance on this "integrally-and-directly-related" test, noting that it is intentionally broader than tax laws:

> The concept of a benefit that is "integrally and directly related" to job performance is a narrow one. The analysis draws a critical distinction between an item that a company provides because the executive needs it to do the job, making it integrally and directly related to the performance of duties, and an item provided for some other reason, even where that other reason can involve both company benefit and personal benefit. Some commenters objected that "integrally and directly related" is too narrow a standard, suggesting that other business reasons for providing an item should not be disregarded in determining whether an item is a perquisite. We do not adopt this suggested approach. As we

-9-

stated in the Proposing Release, the fact that the company has determined that an expense is an "ordinary" or "necessary" business expense for tax or other purposes or that an expense is for the benefit or convenience of the company is not responsive to the inquiry as to whether the expense provides a perquisite or other personal benefit for disclosure purposes. Whether the company should pay for an expense or it is deductible for tax purposes relates principally to questions of state law regarding use of corporate assets and of tax law; *our disclosure requirements are triggered by different and broader concepts*.

Executive Compensation and Related Person Disclosure, 71 Fed. Reg. 53, 158, 53, 177 (Sept. 8, 2006) (emphasis added). Relying on this language, the district court found that the SEC standard—"integrally and directly related"—results in a company disclosing more items than the IRS standard—"primary purpose"—and overruled Dean's objections to Henning's testimony. See District Ct. Order, Feb. 22, 2012, ECF No. 210. Although the district court allowed Henning to testify, it limited the scope of his testimony as it related to Dean's legal duties, the misleading nature of any disclosures, and Dean's intentions. See District Ct. Order 20, Sept. 20, 2011, ECF No. 139.

In support of his argument, Dean relies on United States v. Wintermute, 443 F.3d 993, 1001 (8th Cir. 2006). There, this court affirmed the district court's decision to exclude an expert's testimony because it misconstrued "the legal question at issue." Id. In Wintermute, the expert's testimony erroneously heightened the government's burden of proof. Id. While an expert cannot misconstrue a legal issue, our case law has distinguished instances where parties disagree over the appropriate methodology. Thus, "[w]hile other methods for calculating damages may be available, so long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony." Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2007).

-10-

Dean's counsel subjected Henning to a thorough, multi-day cross-examination, questioning his findings and his underlying methodology. Henning agreed with Dean's counsel that the appropriate criteria for determining a perquisite "is whether it's directly and integrally related to the performance of an executive's duties." Henning was further questioned regarding whether it was his contention that "directly and integrally related is essentially equivalent to primary purpose." Henning responded that "primary purpose is one approach or one methodology to arriving at whether something is integrally and directly related." Henning also testified that although it is possible that a certain expense could be classified differently under each test, he believed that all of Gupta's expenses he identified as perquisites qualified as such under the SEC's integrally-and-directly-related standard. Dean's counsel further pressed Henning on this distinction, and Henning testified that "primary purpose is a very common methodology and approach that's used by other companies, accepted by regulators and so forth."

Henning's reliance on the primary-purpose test was not a basis for excluding his testimony. Instead, the approach available to Dean—and the approach he took—was attacking Henning's methodology on cross-examination. Dean misconstrues Henning's approach by indicating that he relied solely on the "primary-purpose" standard. Henning testified repeatedly that the primary-purpose test was used to determine whether a benefit was integrally and directly related to Gupta's position as CEO of infoUSA. Despite Dean's contention that this standard does not "fit" within this case, "mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony." Synergetics, 477 F.3d at 956. And although Dean repeatedly emphasizes that the primary-purpose test could hypothetically result in a business expense being misclassified as a perquisite, he does not assert that happened in this case.

We conclude that Henning's use of the primary-purpose test as a means for applying the integrally-and-directly-related standard did not misconstrue a legal issue

or alter the legal standard that Dean was required to apply as CFO. Therefore, the district court did not abuse its discretion by admitting Henning's testimony.

## C. Jury Instructions

Dean also contends the district court erred when instructing the jury. We review jury instructions for an abuse of discretion and limit our review to considering whether the instructions, "taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." Brown v. Sandals Resorts Int'l, 284 F.3d 949, 953 (8th Cir. 2002) (internal quotation marks omitted). We review de novo, however, the aspects of Dean's claims that relate to statutory interpretation because they are issues of law. United States v. Petrovic, 701 F.3d 849, 858 (8th Cir. 2012). We do not require that jury instructions "be technically perfect or even a model of clarity." B & B Hardware, Inc. v. Hargis Indus., Inc., 252 F.3d 1010, 1012 (8th Cir. 2001) (internal quotation marks omitted). Finally, even if "a jury instruction is erroneously given to the jury, reversal is warranted only where the error affects the substantial rights of the parties." Brown, 284 F.3d at 953.

### 1. Reliance on Officers Instruction

According to Dean, the district court erred by failing to instruct the jury that he was entitled to rely on information provided by infoUSA officers whom he reasonably believed were reliable and competent. "A party is entitled to an instruction reflecting that party's theory of the case if the instruction is legally correct and there is evidence to support it." Ross v. Garner Printing Co., 285 F.3d 1106, 1112 (8th Cir. 2002) (internal quotation marks omitted). Dean proposed the following jury instruction:

> In discharging his duties, an officer of a corporation is entitled to rely on information, opinions, reports, or statements prepared or presented by officers or employees of the corporation whom the officer reasonably believes to be reliable and competent in the matters presented. An officer is not acting in good faith if the officer has knowledge concerning the matter in question that makes reliance otherwise permitted unwarranted.

The district court declined to give the instruction.

Dean contends this instruction is legally correct based on an unpublished Delaware case, Hampshire Group, Ltd. v. Kuttner, C.A. No. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010). Relying on Hampshire Group, Dean argues that "[u]nder Delaware law, a corporate chief financial officer does not breach his duty of care to the corporation in his review of expenses of the chief financial officer by relying on the representations of the chief executive officer." But the court in Hampshire Group actually held that "when a corporate officer is aware of financial misreporting that involves high-level management and that has evaded the corporation's auditors, and nonetheless certifies that he is not aware of any material weakness in the company's internal controls, he is making a false statement and failing to bring material information to the board, in breach of his duty of loyalty." Id. at *34. The portion of the case Dean cites relates to a corporate officer approving *internal* expense reports in violation of a company's own policy. Id. at *16-20. Hampshire Group does not support Dean's position and actually weakens his argument that the proposed jury instruction was proper based on Delaware law.

Although the district court rejected Dean's proposed instruction, it did give Instruction Number 17, instructing the jury that "[r]eliance on the advice of a professional may be evidence of the absence of a Defendant's intent to defraud." At trial, Dean's counsel argued that his proposed instruction correctly stated "the ability of an officer to rely on information provided by other officers," as opposed to the instruction that was ultimately given to the jury that allowed for reliance on

information provided by professionals. A litigant is not entitled to a "specific formulation" of a jury instruction. Gray v. Bicknell, 86 F.3d 1472, 1485 (8th Cir. 1996).

Dean blames other infoUSA professionals for infoUSA filing false statements, which Dean certified, with the SEC. "As chief financial officer, [Dean]'s very job at [infoUSA] was to manage its financial department and ensure its records and accounts were accurately and fairly maintained, and there is substantial evidence that []he failed to do so." See McConville v. SEC, 465 F.3d 780, 790 (7th Cir. 2006). The requirement of 17 C.F.R. § 240.13a-14 that the "principal executive and principal financial officer" certify a Form 10-K "quite clearly imposes a requirement on those individuals." See SEC v. Brown, 740 F. Supp. 2d 148, 164 (D.D.C. 2010). Because there is no basis in law to support Dean's proposed instruction, and because he is not entitled to a specific formulation, the instructions adequately and fairly represented the law to the jury and the district court did not abuse its discretion.

2. Rule 14a-9 Instruction

Next, Dean contends that the SEC was required to prove scienter for its section 14(a) and Rule 14a-9 claims and that the district court abused its discretion by omitting this standard from Instruction Number 7. Instruction Number 7 required the SEC to demonstrate that Dean "solicited proxies by means of false or misleading proxy statements by *negligently* approving or signing publicly filed proxy statements . . . ." (emphasis added). Rule 14a–9(a) was promulgated under section 14(a) of the Exchange Act and "provides that no proxy statement may contain any false or misleading statement or omission with respect to a material fact." SEC v. Shanahan, 646 F.3d 536, 546 (8th Cir. 2011); see also 17 C.F.R. § 240.14a–9. Section 14(a) "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." TSC

Indus., Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (internal quotation marks omitted).

Whether scienter is an element of an action brought under section 14(a) against a manager or officer of a corporation has not been directly addressed by this court, and the Supreme Court has twice declined to consider it. See Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090 n.5 (1991). In Shanahan, "[w]e agree[d] with those courts that have concluded that scienter is an element, at least for [Rule 14a-9] claims against outside directors and accountants." 646 F.3d at 546-47 (citing Adams v. Standard Knitting Mills, Inc., 623 F.2d 422, 428 (6th Cir. 1980); Salit v. Stanley Works, 802 F. Supp. 728, 733 (D. Conn. 1992)). In an earlier case involving corporate officers and directors, we acknowledged that "[s]ection 14(a) offers no explicit standard of liability," but rejected imposing a strict liability standard on section 14(a) claims. Shidler v. All Am. Life & Fin. Corp., 775 F.2d 917, 926-27 (8th Cir. 1985). In Shidler, we concluded that a strict liability rule was "too blunt a tool to ferret out the kind of deceptive practices Congress sought to prevent in enacting section 14(a)." Id. at 927. We ultimately rejected the plaintiffs' claim because we agreed with the district court's finding that "the defendants were not negligent in issuing the proxy statement." Id.

Dean asks this court to extend Shanahan's holding regarding outside directors and accountants to corporate officers. Relying on the Sixth Circuit's decision in Adams, Dean argues that the legislative history of Rule 14a-9 suggests scienter was intended as an element. While the court in Adams concluded that section 14(a) requires proof of scienter, based partially on legislative history, it explicitly limited its holding to outside accountants.[5] See 623 F.2d at 428 ("[W]e conclude that scienter

---

[5]In a more recent case addressing section 11 of the Exchange Act, the Sixth Circuit in dicta noted that "§ 14(a) does in fact require proof of scienter to state a claim." Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc., ___ F.3d ___, ___ n.3 (6th Cir. 2013) (citing Adams, 623

should be an element of liability in private suits under the proxy provisions as they apply to outside accountants."). Aside from the Sixth Circuit, other circuits that have considered this issue have not imposed a scienter element.[6]

We decline to extend our holding in Shanahan to corporate officers. Scienter is not a required element of a claim brought under section 14(a) or Rule 14a-9 against a corporation's officer. Adams, upon which Shanahan relied, recognized a difference between a corporate issuer—who directly benefits from the proxy vote and is in privity with the shareholders—and an outside accounting firm. See Adams, 623 F.2d at 428. Additionally, in dicta, our case law has twice indicated that we follow a negligence standard. In Shidler, we rejected the plaintiffs' claims "[b]ecause the defendants were not negligent,"[7] 775 F.2d at 927, and in Shanahan "we agree[d] with the district court that the SEC failed to prove a negligent violation of § 14(a) and Rule 14a–9," 646 F.3d at 547. Based on the distinction recognized in Adams and relied upon in Shanahan between outside directors or accountants and the corporate issuer, our previous holdings referencing a negligence standard, and our sister circuits'

_____

F.2d at 430). Because the Sixth Circuit in Omnicare was referencing this issue in passing, it is not clear whether the court was extending its holding from Adams, which was limited to outside accountants and directors.

[6]This includes at least the Seventh, Second, and Third Circuits. See Beck v. Dobrowski, 559 F.3d 680, 682 (7th Cir. 2009) ("Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer."); Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir. 1988) ("Liability can be imposed for negligently drafting a proxy statement."); Herskowitz v. Nutri/Sys., Inc., 857 F.2d 179, 190 (3d Cir. 1988) (rejecting scienter standard for officers and directors).

[7]The Seventh Circuit has relied on our analysis in Shidler for the proposition that claims under Section 14(a) and Rule 14a-9 require negligence. Kennedy v. Venrock Assocs., 348 F.3d 584, 593 (7th Cir. 2003) (citing Shidler, 775 F.2d at 926-27).

interpretations of section 14(a) and Rule 14a-9, we believe the district court was correct to reject Dean's argument. Therefore, we affirm the district court's instruction.

### 3. Rule 13b2-1 and Rule 13b2-2 Instructions

Dean contends that the district court abused its discretion when instructing the jury on the SEC's 13b2-1 claim and 13b2-2 claim because each instruction required the jury to find Dean violated the law if he did not act "reasonably." Dean argues that the SEC was required to prove that Dean acted "knowingly." This issue, as it relates to both claims, is an issue of first impression for our court.

Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2-1. Section 13(b)(2)(A) requires companies to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A).

The Seventh Circuit, relying on the SEC's interpretations of its own regulations and applying Chevron deference, has held that Rule 13b2-1 does not require scienter. McConville v. SEC, 465 F.3d 780, 789 (7th Cir. 2006). "[T]he Commission has previously stated that there is no scienter requirement in SEC Rule 13b2–1 because § 13(b) of the 1934 Securities Exchange Act contains no words indicating that Congress intended to impose a scienter requirement." Id. (internal quotation marks omitted). Similar to the Seventh Circuit's decision in McConville, the Second Circuit has held that "Congress amended § 13(b) to provide that knowing falsification is required before *criminal* liability shall be imposed, plainly implying that falsification of the information to be filed in accordance with § 13(b) need not be knowing in order to lead to civil liability." SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (internal citation, alteration marks, and quotation marks omitted).

We agree with the analysis of our sister circuits in McConville and McNulty and affirm the district court's instruction on the SEC's Rule 13b2-1 claim.

We address Rule 13b2-2 separately. Two circuits have held that knowledge is not required under section 13(b) in general.[8] Rule 13b2–2 provides that "[n]o director or officer of an issuer shall, directly or indirectly . . . [m]ake or cause to be made a materially false or misleading statement to an accountant . . . ." 17 C.F.R. § 240.13b2–2(a). "As with any question of statutory interpretation, our analysis begins with the plain language of the statute." United States v. Behrens, 644 F.3d 754, 755 (8th Cir. 2011) (internal quotation marks omitted). The relevant portion of section 13(b) provides:

> **(2)** Every issuer which has a class of securities registered pursuant to section 78*l* of this title and every issuer which is required to file reports pursuant to section 78*o*(d) of this title shall—
>    **(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> . . . .
>
> **(4)** No criminal liability shall be imposed for failing to comply with the requirements of paragraph (2) of this subsection except as provided in paragraph (5) of this subsection.
>
> **(5)** No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

15 U.S.C.A. § 78m(b)(2), (4)-(5).

---

[8]The Seventh and Second Circuits have stated generally that section 13(b) of the Exchange Act does not impose a scienter requirement. McConville, 465 F.3d at 789; McNulty, 137 F.3d at 740-41.

In support of his argument that the SEC was required to prove that he knowingly violated Rule 13b2-2, Dean relies on the Ninth Circuit's decision in SEC v. Todd, 642 F.3d 1207 (9th Cir. 2011). There, the court held that to be liable under 13b2-2, "one must 'knowingly' make false statements."[9] Todd, 642 F.3d at 1219 (citing United States v. Goyal, 629 F.3d 912, 916 n.6 (9th Cir. 2010)). The court in Todd, relying on Goyal, rejected the SEC's argument that Rule 13b2-2 requires a reasonableness or negligence standard, holding that "'[k]nowledge requires that [the defendant] was aware of the falsification and did not falsify through ignorance, mistake, or accident.'" Id. (quoting Goyal, 629 F.3d at 916). And in Goyal the court held in a *criminal* case under 15 U.S.C. § 78m(b)(4) and (5) that "a lesser mens rea requirement would criminalize a broader swath of conduct," because the statute explicitly required proof of knowledge for criminal liability. Goyal, 629 F.3d at 916 n.6. In addition to Todd and Goyal, Dean cites section 13(b)(5) of the Exchange Act, contending that it requires a "knowing" element be read into Rule 13b2-2.

Based on the foregoing, we conclude that Rule 13b2-2 does not require that the SEC prove Dean acted knowingly. We decline to adopt the Ninth Circuit's holding in Todd. The criminal case it relied upon for its conclusion that Rule 13b2-2 does require proof that a defendant acted knowingly, Goyal, was based on sections 13(b)(4) and (5)—a correct application of the statute in the context of a criminal case because of section 13(b)(4). We similarly reject Dean's additional argument that section 13(b)(5) requires a "knowing" element be inserted into Rule 13b2-2. Applying section 13(b)(5)'s "knowing" requirement to Rule 13b2-2 conflicts with the plain language of the statute: criminal liability triggers section 13(b)(5)'s "knowing" requirement under section 13(b)(4), indicating that it is otherwise not an element of

---

[9]The Ninth Circuit's holding in Todd conflicts with its prior statement in Ponce v. SEC, 345 F.3d 722, 737 n.10 (9th Cir. 2003), that "a plain reading of Section 13(b) reveals that it also does not impose a scienter requirement."

a civil claim.[10]  Further, Dean's reliance on section 13(b)(5) fails to reconcile the fact that it was adopted *after* Rule 13b2-2 was issued,[11] and ignores that Rule 13b2-2 was promulgated pursuant to section 13(b)(2), not (b)(5).[12]  Dean's argument is especially unpersuasive in light of the SEC's contrary construction of Rule 13b2-2,[13] and "[i]t is well established that an agency's construction of its own regulations is entitled to substantial deference."  See Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150 (1991) (internal quotation marks omitted).  In sum, we affirm the district court's Instruction Number 10 as it relates to the Rule 13b2-2 claim.

3.  Section 13(b)(5) Claim

Although we conclude the district court properly instructed the jury regarding the SEC's Rule 13b2-1 and 13b2-2 claims, the SEC has requested that we vacate the

---

[10]This is significant because the Supreme Court has recognized that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Rodriguez v. United States, 480 U.S. 522, 525 (1987) (internal quotation marks omitted).

[11]Section 13(b)(5) was not added to the Exchange Act until 1988.  See Foreign Corrupt Practices Act Amendments of 1988, Pub. L. No. 100-418, § 5002, 102 Stat. 1107, 1415 (1988) (codified at 15 U.S.C. § 78m(b)(5)).

[12]Rule 13b2-2 was promulgated "pursuant to Section 13(b)(2) of the Securities Exchange Act."  See "Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices," Exchange Act Release No. 34–15570, 16 SEC Docket 1143, 1151, 1979 WL 173674, at *11 (February 15, 1979).

[13]According to the SEC's interpretation of Rule 13b2-2, the plain language of section 13(b)(2) and Rule 13b2-2 does not contain a scienter requirement, and "'standards of reasonableness' are to be used in applying [Section 13]."  See id. at *12 (rejecting proposals to include scienter requirement in Rule 13b2-2).

district court's judgment regarding the section 13(b)(5) claim. Appellee's Br. 38 n.7. Dean did not respond to the SEC's request in his reply brief. The third claim of the SEC's complaint alleged that Dean violated section 13(b)(5) of the Exchange Act, as well as Rule 13b2-1. See Pl.'s Compl. 20, ECF No. 1. As previously discussed, section 13(b)(5) of the Exchange Act requires a finding that any violation of that provision be made knowingly. See 15 U.S.C. § 78m(b)(5). The first paragraph of Instruction Number 8 provided that "the SEC alleges that Mr. Das and Mr. Dean falsified, or caused to be falsified, infoUSA's books, records, and accounts, and knowingly circumvented or knowingly failed to implement a system of internal accounting controls . . . ." Later in that same instruction, the jury was instructed that the SEC must prove "that the Defendant did not act reasonably when doing the action described in the first element." Because of these conflicting standards it is not clear whether the jury made the finding necessary for the SEC's section 13(b)(5) claim.

As a result, we vacate the district court's May 29, 2012 Judgment as to Defendant Stormy L. Dean, as well as the accompanying Memorandum and Order, but only as each relates to section 13(b)(5). See J. as to Def. Stormy L. Dean, May 29, 2012, ECF No. 258; Mem. & Order, May 29, 2012, ECF No. 257. We leave it to the discretion of the district court to retain the civil penalties already imposed or reconsider the penalties in light of this decision.[14]

D. Bad Faith Finding

Finally, Dean argues the district court erred by finding that he acted in bad faith toward infoUSA's shareholders. In its May 29, 2012 judgment, the district court "declare[d] that Defendant Stormy L. Dean acted in bad faith toward shareholders of

---

[14]We are in no way suggesting that a new trial is necessary. Cf. Roth v. Black & Decker, U.S., Inc., 737 F.2d 779, 783 (8th Cir. 1984) ("Appellate courts are not inclined to grant a new trial because of an ambiguity in an instruction when it appears that 'the complaining party made no effort at the trial to have the matter explained.'").

InfoUSA, Inc., when committing the acts and omissions that led to this proceeding, and knew his actions were contrary to the interests of InfoUSA and its shareholders." See J. as to Def. Stormy L. Dean 6, May 29, 2012, ECF No. 258. Significantly, whether Dean acted in bad faith was not an issue before the jury, and neither the SEC nor infoUSA raised the issue. Based on the claims the SEC asserted against Dean, the bad-faith finding was unnecessary to a final resolution of this matter. Accordingly, we vacate the district court's finding regarding Dean's bad faith toward infoUSA shareholders.

## III. Conclusion

Accordingly, we: (1) vacate the conclusion that Dean violated section 13(b)(5) of the Exchange Act; (2) vacate the finding that Dean acted in bad faith; (3) remand for reconsideration the civil penalties imposed; (4) remand for all further proceedings consistent with this opinion; and (5) affirm the case in all other respects.

_____